Edmond duPONT, suing on behalf of himself and all others similarly situated, Plaintiff,

v.

H. Ross PEROT et al., Defendants.

No. 71 Civ. 5506.

United States District Court,
S. D. New York.

April 9, 1973.

Cadwalader, Wickersham & Taft, New York City, for plaintiff; George D. Reycraft, New York City, of counsel.

Weil, Gotshal & Manges, New York City, for defendants; Peter Gruenberger, New York City, of counsel.

## OPINION

TENNEY, District Judge.

This is an action brought by plaintiff Edmond duPont on his own behalf and on the behalf of all others similarly situated, against defendants for (1) breach of fiduciary duty and (2) common law fraud. Diversity jurisdiction is alleged pursuant to 28 U.S.C. § 1332 (1970). Plaintiff now moves, pursuant to Fed. R.Civ.P. 23(c)(1) and (2), for an order declaring that the action be allowed to proceed as a class action. The motion is denied.

Plaintiff was a general and limited partner of duPont, Glore Forgan & Co. (hereinafter "DGF")—a former member firm of the New York Stock Exchange (hereinafter "NYSE")—until he was involuntarily retired as a general partner on April 27, 1971. DGF was a limited partnership organized under the laws of the State of New York, which had received capital contributions from the following groups: (1) 70 general partners—approximately $20 million; (2) 35 special partners—approximately $3 million; (3) 30 limited partners—approximately $16 million; (4) 100 pledgors-approximately $24 million; (5) 15 subordinated lenders—approximately $15 million; and (6) 4 retired partners or their assignees—approximately $3 million; (hereinafter collectively referred to as "capital contributors").

Defendant H. Ross Perot is and was, at all times relevant to this action, majority holder of the common stock of, and Chairman of the Board and Chief Executive Officer of defendant Electronic Data Systems Corporation (hereinafter "EDS"). Perot is also the controlling stockholder of defendant PHMFG Corporation (which is the same entity as defendant PHM Corporation) and is the principal partner of defendant PHM & Company. Defendant Morton H. Meyerson was, at all relevant times, a vice president and director of EDS. Defendant Milledge A. Hart, III is and was, at all relevant times, president and a director of EDS. Defendant EDS is primarily engaged in designing, installing and operating business information systems for its customer-clients.

## THE COMPLAINT

Plaintiff alleges that on July 3, 1970, EDS and DGF entered into an agreement (hereinafter "systems contract") whereby EDS was to provide all of DGF's electronic data processing services. Under the terms of the contract, all of DGF's existing data processing personnel became employees of EDS, and EDS became, in effect, DGF's data processing department. By virtue of this relationship, EDS gained access to and, for data processing purposes, control of all of DGF's internal and external records, all messages in transit over DGF's private wire system, and all of DGF's customer records and files. The systems contract provided that all information communicated by DGF to EDS would be received in strict confidence and used only for contract purposes. It is further alleged that, as contemplated by the contract, DGF reposed special trust and confidence in EDS. Plaintiff claims, therefore, that as of August 1, 1970, the date of performance of the systems contract, EDS, its directors and employees, assumed the position of fiduciaries to DGF and its capital contributors.

EDS and DGF entered into a second agreement, dated July 3, 1970, which provided that EDS would register and issue to DGF 100,000 shares of EDS common stock in exchange for all the common stock of Wall Street Leasing Corporation which leased computers, furniture, fixtures and space to DGF.

In October 1970, as a result of information gathered from its required annual surprise audit, the NYSE notified DGF that it must raise $5 million in capital to avoid a violation of NYSE Rule 325, which requires that a member firm's aggregate indebtedness not be in excess of 20 times its net capital. In November 1970, defendant Meyerson, knowing of DGF's financial straits, suggested a loan of capital to DGF from Perot or EDS. Shortly thereafter, the NYSE raised the amount of required new capital to $10 million.

Plaintiff claims that on November 20, 1970, a comprehensive understanding as to the terms of the proposed loan was negotiated. Perot or EDS was to deposit $5 million with DGF as a 90-day subordinated loan. In return, DGF was to raise $5 million in additional capital, allow no further withdrawals of capital after December 1, 1970, and give EDS or Perot the right to purchase a 25% interest in a successor corporation to DGF which was to be formed within two years.

The NYSE continued to pressure DGF to raise the additional capital required to bring its net capital ratio within acceptable limits. It informed DGF that unless Rule 325 was complied with, it would suspend DGF's membership in the Exchange, thus causing DGF to liquidate. Defendants, plaintiff alleges, being aware of these pressures, presented a new form of agreement to the partners of DGF on November 25, 1970. The new terms provided for a $10 million capital contribution to DGF by Perot or EDS in the form of a 90-day subordinated loan in return for the right to purchase not less than 51% of the stock of a new successor corporation to be formed immediately. DGF partners would be limited to purchasing a maximum of 49% of the stock, the actual percentage to be proportional to the success of the partners in raising an additional $15 million in capital.

Plaintiff claims that when he objected to the new agreement as a gross deviation from the November 20th proposal, the EDS and Perot representatives agreed to rewrite the agreement to conform to the terms agreed upon November 20. Plaintiff alleges that in reliance upon this representation, defendants Hart and Meyerson induced several DGF partners (including plaintiff) to sign the November 25 agreement. Plaintiff further claims that if the terms of the original agreement had been honored on November 25, the surprise audit, filed that day, indicates that the $10 million to be infused into DGF would have lowered its net capital ratio below 11 to 1, well within the Rule 325 limits.

On December 3, 1970, defendants presented to the DGF partners a third proposal, essentially similar to the November 25 proposal. Most of the DGF partners signed the agreement. Since, plaintiff alleges, the November 25 audit showed DGF to have a net capital worth of over $45 million, this agreement would have enabled Perot to gain control of, and perhaps 100% of, DGF without returning to DGF's capital contributors any of the $45 million in capital. Plaintiff claims defendants were able to secure the signatures through their intimate knowledge of DGF's financial position and by intentionally delaying the registration of DGF's 100,000 shares of EDS, which, if they had been registered, would have added $3.5 million to DGF's net capital worth. However, since not all of DGF's general, special and limited partners signed the December 3 agreement, plaintiff claims it was of no force and effect.

On December 16, 1970, PHM Corporation (which was organized by defendants for the purpose of taking over control of DGF under the December agreement) made a $10 million 90-day subordinated loan to DGF. Soon thereafter, defendants, it is alleged, began to assert control over DGF's management to the detriment of DGF. For example, plain-

tiff claims that defendants frustrated plaintiff's and other DGF representatives' efforts to secure investors other than PHM and Perot.

Finally, it is alleged that, on March 17, 1971, defendants, by using the information gained from their position of trust and their increasing control over the management of DGF, succeeded in securing the signatures of most general, special and limited partners, pledgors and subordinated lenders of DGF to an agreement which gave defendants complete control over DGF without returning any of DGF's net worth to the capital contributors. Under the agreement, DGF's capital and assets were transferred to duPont, Glore Forgan, Incorporated (hereinafter "DGF, Inc."), a corporation controlled and principally owned by defendant Perot through PHM Corporation. Plaintiff claims that under the March 17 agreement none of DGF's general partners received any compensation for their contributions, while the other capital contributors' compensation was, in part, contingent upon a new audit to be performed after the transfer of assets from DGF to DGF, Inc.

Plaintiff asserts two causes of action based on these alleged facts: first, that defendants breached the fiduciary duty which they assumed under the systems contract by wrongfully using the confidential information and trust reposed in them to their own advantage and to the detriment of plaintiff and his proposed class; and second, that defendants, by making material misrepresentations on November 25, 1970 which they knew to be false, fraudulently induced plaintiff and his proposed class into signing an agreement which wrongfully deprived them of their property.

Defendants' answer, in substance, denies that the systems contract gave rise to a fiduciary relationship, denies the wrongful use of any confidential information which came into its possession under the systems contract, alleges that plaintiff, in fact, was the major contributing cause of DGF's financial problems, and asserts that it proposed the various financial agreements named in the complaint, and entered into the March 17 agreement, with the cooperation and encouragement of the NYSE and the Securities and Exchange Commission. Defendants also interpose twelve affirmative defenses including, *inter alia*, the defenses of unclean hands (charging plaintiff with fraud), estoppel, waiver, lack of standing, lack of jurisdiction, failure to state a cause of action, etc. Defendant PHM & Co., as assignee of three of plaintiff's pledgors, asserts three counterclaims for breach of the pledge contracts.

## CLASS ACTION MOTION

Plaintiff now moves this Court for an order declaring that this action be maintained as a class action. The proposed class consists of all persons who contributed capital to DGF (or its predecessor F. I. duPont & Co.) by or after October 1, 1970, and who have not since received repayment in full. The proposed class includes, therefore, the 254 capital contributors described *supra* with a total capital contribution of approximately $81 million dollars.

Before proceeding to a discussion of the disposition of plaintiff's motion, the Court wishes to touch upon two issues raised by the parties which, while not dispositive of the motion, require comment. The first issue, and one to which both parties have devoted a great deal of attention, is the role which "facts" extrinsic to the complaint are to play in the determination of a class action motion. Defendants have amassed a truly impressive amount of documentation to support the charges raised in their opposing papers that plaintiff was the true cause of DGF's financial ruin and that defendants were the saviors of the NYSE. Plaintiff, in response, asserts that the merits of his claim are irrelevant to the Court's determination of his

motion. (Pl.'s Reply Memo in Support at 1–3; Pl.'s Supp. Memo in Support at 5–11.) Defendants, on the other hand, urge this Court to consider the lack of merit in plaintiff's claims and go so far as to argue that plaintiff's failure to rebut defendants' accusations mandates a denial of the motion. (Defs.' Supp. Memo in Opposition at 5–21.)

■ While both parties have vigorously pursued their respective positions, this Court finds it unnecessary to reach the issue since other grounds exist which compel denial of plaintiff's motion. This does not mean, however, that the Court has determined the motion in a factual vacuum.

"[A] court must carefully examine the class on whose behalf plaintiff sues, to decide if it is a true class and if the plaintiff is the proper representative." Green v. Wolf Corp., 406 F.2d 291, 298 (2d Cir. 1968, cert. denied, 395 U.S. 977, 89 S.Ct. 2131, 23 L.Ed.2d 766 (1969).

In conducting this examination, the district court is not bound by the four corners of the complaint. Rather, it should investigate the underlying facts to determine whether the proposed class is a true class and if the plaintiff is a proper representative. The Court of Appeals has held in this regard that

". . . the judgment of the trial judge should be given the greatest respect and the broadest discretion, particularly if . . . he has canvassed the factual aspects of the litigation." City of New York v. International Pipe & Ceramics Corp., 410 F.2d 295, 298 (2d Cir. 1969).

To this end, and not for the purpose of evaluting the merits of plaintff's claims, the Court has considered the facts adduced by defendants.

■ The second issue concerns the very nature of plaintiff's cause of action. Plaintiff, in his complaint and supporting papers, claims that as a result of the systems contract EDS entered into a fiduciary relationship with *all* of DGF's capital contributors. None of the cases cited by plaintiff in his discussion of the fiduciary relationship supports that claim. The pledgors and subordinated lenders named in the complaint are nothing more than creditors of DGF whose relationship with DGF is controlled by their individual contracts. This Court can find no precedent for the proposition that a fiduciary relationship is created between a creditor and a third party merely by reason of a contract between the third party and the creditor's debtor. Furthermore, it would appear that only general partners can assert a cause of action for wrongful conduct which damages the partnership. Sloan v. Clark, 18 N.Y.2d 570, 277 N.Y.S.2d 411, 223 N.E.2d 893 (1966). On the other hand, it is not always necessary for privity of contract to be established in order to recover for fraud. 24 N.Y. Jur., Fraud & Deceit, § 200 (1962). However, it is not necessary that the Court reach this issue since plaintiff has failed to demonstrate that he is a fair and adequate representative of the class or that common questions of fact and law predominate over the individual issues in the case.

### 23(a)(3) and (4)

Rule 23(a)(3) requires that the claims or defenses of the representative party be typical of the claims or defenses of the proposed class. Rule 23(a)(4) requires that the representative party fairly and adequately protect the interests of the proposed class. Since 23(a)(3) has been equated with the 23(a)(4) requirement of coextensiveness of interests, *see, e. g.,* Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 563 (2d Cir. 1968), 3B Moore, Fed.Prac. ¶ 23.06–2 (2d ed. 1969), discussion of both subdivisions will be conducted under 23(a) (4).

■ There are several elements of 23(a)(4) which the Court must consider before determining the adequacy of rep-

resentation: (1) whether the interests of the named plaintiff are coextensive with the interests of the other members of the proposed class; (2) whether his interests are in any way antagonistic to the interests of the proposed class; and (3) any other facts bearing on the ability of the named party to speak for the proposed class. 3B Moore, Fed.Prac., ¶ 23.07[1].[1]

Defendants assert that plaintiff's interests in this litigation are anything but coextensive with the interests of his proposed class. While numerous theories are offered in support of this premise, the central theme of defendants is that by signing the March 17 agreement over 90% of the proposed class have chosen the manner in which they desire to be compensated for their capital contributions and, therefore, that plaintiff's suit seeks to undo their expressed will. If the successful prosecution of this action necessitated rescission of the March agreement, the Court would end its inquiry at this point. *See, e. g.,* Schy v. Susquehanna Corp., 419 F.2d 1112, 1117 (7th Cir.), cert. denied, 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970). Since rescission would undoubtedly lead to the withdrawal of the Perot funds and, thus, the liquidation of DGF, it can safely be presumed that such a course of action would not be coextensive or compatible with the interests of many of the proposed class.

Furthermore, the March 17 agreement contains several provisions which release all the signatories from any claims regarding the negotiations leading to the agreement and from any claims regarding the management of the affairs of DGF by its general partners. (Pl.'s Aff. in Opp. Exhibit A ¶ 20, Schedule 4 ¶ 3.) Thus, signing general partners are released from the claims of the other capital contributors who also signed, including claims of other general partners for contribution for their loss of capital; signing subordinated lenders have released the signing general partners from liability for return of their capital; and signing pledgors have released signing general and limited partners from liability for the return of capital pledged under their individual contracts.

■ Plaintiff claims these objections are not well founded since he only seeks money damages and not rescission of the agreement. The law is well settled in New York that one who is induced by fraud to enter into a contract

"may pursue one of three remedies: 'He may rescind the contract absolutely, and sue in an action at law to recover the consideration parted with upon the fraudulent contract. . . . He may also bring an action in equity to rescind the contract, and in that action have full relief. . . . Lastly, *he may retain what he has received, and bring an action at law to recover the damages sustained.'*

\*    \*    \*    \*    \*    \*

"[T]he releases given by the plaintiff, which the defendants' answer pleads as a defense, do not bar the present action at law whereby plaintiff seeks damages due to alleged fraudulent misrepresentations and concealments which induced him to give such releases." Goldsmith v. National Container Corp., 287 N.Y. 438, 442–443, 40 N.E. 2d 242, 244 (1942) (emphasis in the original).

Thus, each member of the proposed class has an option to rescind the contract or to affirm it and sue for damages. Furthermore, each member of the class has an option to rescind the releases given. Erbe v. Lincoln Rochester Trust Co., 3 Misc.2d 371, 151 N.Y.S.2d 56, 75 (Sup.

---

1. Pg. 12. Although the cited authority lists the proportion of named parties to the number of members of the proposed class as a factor to be considered, the rule in this circuit is otherwise. *See,* Eisen v. Carlisle & Jacquelin, 391 F.2d 555, 563 (2d Cir. 1968).

Ct.), rev'd on other grounds, 2 A.D.2d 247, 154 N.Y.S.2d 184 (1956).

Plaintiff has already made his choice: he has informed the Court that he does not wish to challenge the contract but, rather, has decided to sue for his damages. Moreover, plaintiff is obviously indifferent as to whether the releases are rescinded or affirmed. Since he is not a signatory to the agreement, he has released no one and no one has released him. But the signing members (over 90%) of his proposed class will first have the opportunity to make that choice should the Court grant plaintiff's motion.

If the requisite members of the proposed class elect to rescind, then the March agreement will be voided and DGF will almost certainly face liquidation. Furthermore, each member of the proposed class has the option not only to rescind the release vis-a-vis the named defendants, but they may also void the intraclass releases since they, too, were allegedly obtained by fraud. This would result in the opening of a pandora's box of liability among the members of plaintiff's proposed class running into the tens of millions of dollars.

■ The Court admits that there is no certainty that the events described *supra* will come to pass. But this Court must consider not only actual conflicts of interest between plaintiff and his purported class, but also the potential conflicts arising from the litigation. *See, e. g.,* Free World Cars, Inc. v. Alfa Romeo, 55 F.R.D. 26, 29 (S.D.N.Y.1972). In making that assessment, it requires no stretch of the imagination to find that the potential for conflict of interest in the maintenance of this suit, between plaintiff and those who felt they had salvaged something from what seemed to be a hopeless situation and who had immunized themselves from staggering liability, is of a high order of magnitude. *Cf.,* Minersville Coal Co., Inc. v. Anthracite Export Ass'n, 55 F.R.D. 426 (M.D. Pa.1971).

This, however, is not the only manner in which plaintiff has failed to meet the requirements of 23(a)(4). "Antagonism may be implied from action of the members of the class that is inconsistent with the purported representative's opinion, or from the action of the representative in relation to the class." 3B Moore, Fed.Prac., ¶ 23.07[3] (2d ed. 1969). Both indicia of antagonism are present in the case *sub judice.*

Defendants have asserted that six actions previously filed in various courts naming plaintiff, either directly or indirectly as a partner of DGF (or its predecessor F. I. duPont & Co.), as a defendant therein are evidence of such antagonism. Plaintiff counters by claiming that these suits are not directed at the very same issue raised by the pending litigation and, thus, do not evidence the requisite antagonism. *See,* 3B Moore, Fed.Prac., ¶ 23.07[3] at 23–403– 05 (2d ed. 1969). The Court does not agree.

It is true that the suits do not charge the named defendants with breach of fiduciary duty. Three of them, however, allege that plaintiff, either directly or indirectly as a partner of DGF, misrepresented the financial status of DGF. The gravamen of the alleged misrepresentation is that DGF, prior to the time period relevant to the instant case, was already in financial ruin. This is the very same accusation which is made by the instant defendants and denied by plaintiff. There is no doubt that this is precisely the type of antagonism contemplated by 23(a)(4).

Defendants have further asserted that plaintiff was prepared to sign the agreement which he now challenges as being induced by fraud, on the condition that defendants would agree to assume two bank loans, taken in the name of plaintiff, for an amount in excess of $3 million. This charge is supported by sworn affidavit. (Shlakman Aff. ¶¶ 3–7.) Plaintiff's own affidavit refutes this accusation only to the extent that he

claims the loans to have been DGF's obligation. There is no denial that he, too, would have signed the March 17 agreement had his terms been acceptable to defendants. It is difficult for this Court to believe that had defendants acceded to plaintiff's demands, he would now be challenging the agreement as one induced by fraud, particularly in the light of letters from both banks informing DGF that they considered the loans to be plaintiff's personal obligation. (Defs.' Aff. in Opp., Exhibit Q.)

There are additional indications that plaintiff is not an adequate representative of his proposed class. Plaintiff's suit was filed nearly one year ago. Not one member of his purported class has since attempted to join him.[2] Plaintiff claims that since the vast majority of the class are not aware of his suit they could not have intervened. The Court can hardly be expected to lend much credence to that argument in the light of two articles appearing in The New York Times and The Wall Street Journal. Many, if not most, of the members of plaintiff's proposed class are sophisticated investors who can be presumed to read at least one of those newspapers. Moreover, even the members of plaintiff's immediate family have not sought to intervene, although plaintiff admits their knowledge of the suit. Indeed, three members of the duPont family have assigned to one of the defendants their claims as plaintiff's pledgors, which are asserted herein as counterclaims. Furthermore, two of plaintiff's former partners, and members of his proposed class, have submitted affidavits to this Court contravening plaintiff's allegations of breach of fiduciary duty and fraud.

■ In the light of such overwhelming conflict of interest and antagonism between plaintiff and his proposed class, this Court finds that the requirements of Fed.R.Civ.P. 23(a)(3) and (4) have not been met.

### 23(b)(3)

While the Court feels that plaintiff's failure to meet the 23(a)(3) and (4) requirements is sufficient to warrant denial of the motion, he has also failed to demonstrate that common questions of law and fact predominate over individual questions in accordance with 23(b)(3).

Even assuming that plaintiff is correct in his assertion that the alleged breaches of fiduciary duty and misrepresentation evolved out of a common nucleus of operative facts, his motion must still be denied. Plaintiff's cause of action differs from typical securities fraud class action cases upon which he so heavily relies. Defendants in a common law fraud action have several defenses available to them that are not ordinarily present in securities cases.

■ The facts in the instant case indicate that defendants have several of such defenses available to them. As to plaintiff's second cause of action (for misrepresentations inducing plaintiff and several members of his proposed class to sign the November 25 agreement), defendants may interpose the defense of waiver. The gravamen of that cause of action is that defendants told plaintiff that the terms of the agreement would be amended to conform to the terms of an earlier proposal. It must have become obvious to plaintiff, and to the members of the purported class, within a short time after the agreement was executed, that the terms had not been so changed. Nevertheless, they chose to accept a $10 million loan pursuant to the agreement. When the benefits of a contract are retained with

---

2. Pg. 18. While the Second Circuit in Eisen v. Carlisle & Jacquelin, *supra,* 391 F.2d 555, held that intervention of proposed class members was not *essential* to a favorable disposition of a class action motion, *several cases within the circuit have considered lack of intervention as a factor* in determining such motions. See, e. g., Guttmann v. Braemer, 51 F.R.D. 537, 539 (S.D.N.Y.1970).

knowledge of the fraud, the defrauded party waives his right to damages for the fraud. However, whether affirmance of the contract constitutes affirmance of the fraud is a matter of intent and a question of fact to be resolved by a jury. 422 W. 15th St. v. Johnson's Estate, 258 App.Div. 227, 16 N.Y.S.2d 283 (1939). Such a defense, therefore, would lead to many individual questions of fact and law as to the intent of plaintiff and the members of his proposed class when they retained the benefits of the November 25 agreement.

The same defense is available against the first cause of action (for breach of fiduciary duty). Before the March 17 agreement was executed, a mass meeting of all the capital contributors of DGF was held under the auspices of the NYSE. Speakers from the firm (DGF) and the NYSE explained the terms of the agreement and the events leading to its negotiation. Defendants are thus in a position to argue, and indeed they so do, that even if it is assumed that breaches of fiduciary duty did occur prior to the execution of the agreement, the members of the class waived the breach by executing the agreement with full knowledge of all the facts preceding the agreement. This, too, would necessitate the resolution of individual questions of fact and law as to the knowledge and intent of the members of the proposed class.

Such defenses vitiate the common core alleged by plaintiff.

"[I]n some cases individual defenses may decimate the 'class' of those ultimately entitled to recover, though general illegality of defendant's action may have been established. Such a result would indicate that those individual defenses and claims were, realistically, predominant over the general common issue." 3B Moore, Fed.Prac. ¶ 23.45[2] at 23–760 (2d ed. 1969).

*See, e.g.,* City and County of Denver v. American Oil Co., 53 F.R.D. 620 (D. Colo.1971).

■ Finally, this Court disagrees with plaintiff's contention that conditional class notices be sent in order to determine which members of his proposed class do not want to join him.

"It is no answer to say that those [members of the proposed class] who do not desire to be represented by plaintiff may opt out under the provisions of Rule 23(c)(2). The machinery of the Rule, with its attendant expense, should not be brought into play unless initially plaintiff, who has the burden of proof, justifies its application." Free World Foreign Cars, Inc. v. Alfa Romeo, *supra,* 55 F.R.D. at 29.

Therefore, and for the foregoing reasons, plaintiff's motion for an order allowing the action to proceed as a class action is denied.

So ordered.