CITIZENS AND SOUTHERN SECURITIES CORPORATION, Plaintiff,

v.

Milton BRATEN and Estate of Bernard Braten, Defendants.

No. 88 Civ. 2477(CES).

United States District Court, S.D. New York.

Feb. 16, 1990.

---

Marshall H. Lichtenstein, Atlanta, Ga., for plaintiff.

Karl L. Kenyon, Kenyon & Lusk, Anderson, S.C., for defendants.

## MEMORANDUM DECISION

STEWART, District Judge:

Plaintiff Citizens and Southern Securities Corporation ("C & S Securities") brought suit alleging causes of action against defendants Milton Braten and the Estate of Bernard Braten (the "Estate") arising from circumstances surrounding a discount brokerage account opened by the Estate with the Citizens and Southern National Bank of South Carolina ("C & S South Carolina").[1]

Defendants move for summary judgment pursuant to Fed.R.Civ.P. 56 as to all the plaintiff's claims and its own counterclaim.[2]

---

1. In 1986, C & S South Carolina was acquired by the Citizens and Southern Corporation headquartered in Atlanta, Georgia ("C & S"), a separate and independent entity. The former Discount Brokerage Division of C & S South Carolina which had used National Financial Service Corporation to execute and clear their brokerage transactions was placed into the plaintiff, Citizens and Southern Securities Corporation ("C & S Securities"), a subsidiary of C & S. C & S Securities cleared its transactions through Broadcourt Capital Corporation ("Broadcourt").

2. Plaintiff alleges six causes of action:
   I. An action on account for sums owed by the Estate to plaintiff for $263,244.40 plus interest, costs and attorneys' fees;

II. an action on account stated by the Estate for $259,664.52 plus interest, costs and attorneys' fees;

III. breach of contract by the Estate for failing to meet a margin maintenance call on October 26, 1987;

IV. holding Braten personally liable for all amounts due to plaintiff by the Estate as Braten used the Estate as his alter ego, agent and instrumentality;

V. a statutory fraud claim pursuant to Section 10(b) of the Security Exchange Act of 1934, 15 U.S.C. § 78j(b) and Rule 10b–5, 17 C.F.R. § 240.10b–5;

VI. common law fraud.

Defendants assert a counterclaim in their answer alleging that as broker for the Estate plain-

Plaintiff cross-moves for partial summary judgment as to Counts I through IV in its complaint and defendants' counterclaim. In addition, plaintiff moves to amend its complaint and to strike the affidavits of James W. Strong and John W. Brown, III, which defendants had submitted in opposition to plaintiff's motion for partial summary judgment and in support of their own cross-motion for summary judgment.

### Background Facts

In 1984, the Estate, with the deposit of approximately $100,000 worth of stock certificates by defendant Braten, opened a securities margin account (the "Account" or "Estate Account") with C & S South Carolina. Defendant Braten or his agent, Larry Cornfield, were informed when margin calls were issued for the Account. It is undisputed that until the events in question, defendants met all their margin calls. Over its course more than $1,000,000 was received by either C & S South Carolina or C & S Securities for the Account. Payments made by third-party checks were accepted without objection by C & S South Carolina or C & S Securities. The equity in the Account was over $1,000,000 at several times, and as of September 27, 1987 the Account's equity was in excess of $500,000. The parties agree that on October 14, 1987, the Estate met a margin call in order that the Account remain in compliance with Regulation T, 12 C.F.R. §§ 220.1—220.130. The instant dispute essentially centers around an alleged subsequent margin call.

Plaintiff contends that a maintenance call for approximately $142,000 was made pursuant to the Rules of the New York Stock Exchange and/or the Broadcourt Capital Corporation and was issued on October 15, 1987. Defendants were told the margin call had to be met by October 19, 1987.[3] According to plaintiff, defendants requested and received an extension to answer the margin call. Due to the stock market crash on October 19, 1987 (the "October crash"), defendants' position deteriorated. When defendants did not meet the margin call subsequent to October 19th, plaintiff liquidated the security positions in defendant's account on October 26, 1987, leaving a balance due plaintiff of $259,664.52.[4]

Defendants counter that no request for money was made of them to cover any margin calls on or between October 14, 1987 and October 16, 1987. They assert that liquidation of the Account should have occurred no later than October 16, 1987 and that plaintiff, as the broker for the Estate, was "negligent, grossly negligent, reckless, willful, and wanton in failing to manage the account and liquidate it properly to avoid losses to its client" by waiting until after the October crash to liquidate the Account. Defts' Brief In Opposition at 3–5.

Finally, defendants argue that since the Estate Account was opened with C & S South Carolina it never had any contractual relationship with C & S Securities, the plaintiff in this action. Therefore, defendants assert that they should not be held accountable for the actions of "other par-

---

tiff was "negligent, grossly negligent, reckless, willful, and wanton in failing to manage the account and liquidate it properly to avoid losses to its client." The counterclaim further alleges that the plaintiff's actions "were in violation of applicable law and regulations." The precise nature of defendant's counterclaim is not clear given its broad wording. Indeed, it appears even defendants are unsure. Defendants' papers characterize the counterclaim as a negligence cause of action in one paragraph and a breach of contract in the next paragraph. *See* Defendants' Brief in Opposition to Plaintiff's Motion for Partial Summary Judgment ("Defts' Brief in Opposition") at 4. We construe the counterclaim as a claim against plaintiff for negligence. *See* Fed.R.Civ.P. 8(f) (pleadings shall be construed so as to do "substantial justice").

3. Plaintiff states that the alleged October 15, 1989 call for additional margin was made pursuant to New York Stock Exchange Rule 431(f)(6) ("Rule 431"), 2 CCH New York Stock Exchange Guide ¶ 2431, since it was a margin maintenance call, and not Regulation T as alleged in the original complaint. Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment ("Pltf's Brief in Opposition") at 4 n. 3. It is this correction which is the basis for plaintiff's Fed.R.Civ.P. 15(a) motion for leave to amend the complaint.

4. On October 19, 1987, the Dow Jones Industrial Average fell about 508 points.

ties," presumably referring to allegedly negligent conduct of C & S South Carolina. January 26, 1989 Defendants' Memorandum In Support of Motion For Summary Judgment ("Defts' Memo.") at 10.

## Discussion

### Plaintiff's Motion To Strike the Strong and Brown Affidavits

■ In support of their motion for summary judgment and in opposition to plaintiff's motion for partial summary judgment, defendants submitted affidavits from James W. Strong and John W. Brown, III. These affiants render opinions regarding what they consider the lack of care exhibited by plaintiff toward the Estate account.

Plaintiff moves to strike these affidavits on the grounds that these affiants are not qualified to render an opinion as to the relevant issues in this action, and that there is an insufficient foundation for these opinions. In particular, plaintiff asserts that defendants' affiants are familiar with only the standards required of full-service brokerage firms and have no exposure to the standard procedures or the standards of care required of a discount broker-dealer such as plaintiff. In support of this argument plaintiff submits its own affidavit from Anthony J. Negus, a securities consultant, which details the differences between the responsibilities of full-service brokers and discount broker-dealers.

In their answering papers, defendants do not contest plaintiff's assertion that there is a difference between the responsibilities of a full-service brokerage firm and a discount brokerage firm. They further do not contest plaintiff's assertion that plaintiff is a discount broker-dealer. Finally, defendants do not contest plaintiff's assertion

that Strong and Brown's area of expertise may lie solely in the area of full-service brokerage firms. Defendants merely counter that "assuming the worst case scenario," presumably that Strong and Brown are only qualified to speak as to the responsibilities of full-service brokers, these affiants should nonetheless be heard as experts since their profession generally "deals with the subject in hand." Defendants' Brief in Opposition to Plaintiff's Motion to Strike ("Defts' Motion to Strike Brief") at 3. It is defendants' view that plaintiff's objections go only to the weight accorded the affidavits, not to whether the affidavits should be accepted by the court.[5] Defts' Motion to Strike Brief at 1–2.

In light of the apparent differences between the responsibilities of full service and discount brokers we question the relevancy of the information and opinions contained in the Strong and Brown affidavits to the issues in the instant action. However, if "specialized knowledge will assist the trier of fact to understand the evidence," a court may permit the opinion of a qualified witness to be heard. See Fed.R. Evid. 702.

Accordingly, we will accept the proffered affidavits attached to the defendants' papers for the limited purpose of helping to provide us with a general background as to working of investment brokers, particularly how full-service brokers handle investment accounts. Further, we accept the affidavits in the realization that this approach is not necessarily required of discount broker-dealers. With that understanding and limitation, we deny plaintiff's motion to strike the Strong and Brown affidavits.[6]

---

5. Defendants' other convoluted argument regarding a third party's liability for waste if they participate with an executor who has acted improperly is without merit.

6. Plaintiff moved pursuant to Fed.R.Civ.P. 12(f) which relates to matters in the pleadings. Courts have held that a Rule 12(f) motion is an inappropriate method for challenging the admissibility of evidence in an affidavit. See Morgan v. Sears, Roebuck and Co., 700 F.Supp. 1574, 1576 (N.D.Ga.1988) (proper method for challenging admissibility of evidence in affida-

vit is to file a notice of objection to the challenged testimony). However, since the federal rules do not address the challenging of affidavits, other courts have permitted affidavits to be challenged pursuant to Rule 12(f). See McLaughlin v. Copeland, 435 F.Supp. 513, 519 (D.Md.1977); Monroe v. Bd. of Ed. of the Town of Wolcott, Conn., 65 F.R.D. 641, 647 (D.Conn. 1975); cf. Perma Research and Development Co. v. Singer Co., 410 F.2d 572, 578–79 (2d Cir.1969); but see Krass v. Thomson–CGR Medical Group, 665 F.Supp. 844, 847 (N.D.Cal.1987) (Rule 12(f) does not apply to a motion). In view of our

*Motion to Amend the Complaint*

■ Plaintiff moves for leave to amend the complaint pursuant to Fed.R.Civ.P. 15(a). Specifically, plaintiff asserts that the original complaint inaccurately stated Regulation T, 12 C.F.R. §§ 220.1–220.130) as the basis for the margin maintenance call given in the securities account of Defendant.[7] Plaintiff wishes to amend the complaint to reflect its contention that the basis for the additional margin call was made pursuant to New York Stock Exchange Rule 431 and/or the margin requirements of Broadcourt Capital Corporation, the plaintiff's clearing broker-dealer.[8]

Rule 15(a) of the Federal Rules of Civil Procedure states that leave to amend "shall be freely given when justice so requires it." The Supreme Court has stated:

> [i]n the absence of any apparent or declared reason—such as undue delay, bad faith, or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc. —the leave sought should, as the rules require, be "freely given."

*Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *see also United States v. Continental Illinois National Bank and Trust*, 889 F.2d 1248, 1254 (2d Cir.1989) (quoting *Foman, supra*).

■ Prejudice to the opposing party is ordinarily the most compelling reason for denying a motion to amend under Rule 15(a). *See* 6 Wright & Miller, Federal Practice and Procedure § 1487; *cf. Barrows v. Forest Laboratories, Inc.*, 742 F.2d 54, 58 (2d Cir.1984) (undue delay, bad faith, and prejudice to opposing party are the "touchstones" of court's discretion to deny leave to amend). Prejudice has been found when proposed amendment contained an unexpected allegation or defense. *See Evans v. Syracuse City School District*, 704 F.2d 44, 47 (2d Cir.1983). Prejudice may also occur when the proposed amended pleading is interposed after the completion of discovery, or is based upon a new set of operative facts. *See Ansam Associates Inc. v. Cola Petroleum, Ltd.*, 760 F.2d 442, 446 (2d Cir.1985).

Plaintiff alluded to the possibility of amending the original complaint in its early motion papers. Indeed, defendant addressed the issue of plaintiff's contemplated change in its own motion papers. *See* Defendants' Reply to Plaintiff's Brief in Opposition to Defendant's Summary Judgment Motion ("Defts' Reply") at 1–3. We disagree with plaintiff that the proposed amendment will not necessitate a "second discovery process" particularly since discovery is not yet complete. Moreover, the differences between Regulation T requirements and maintenance calls were addressed by defendants in their deposition

---

disposition of the motion, we do not need to resolve whether Rule 12(f) may be used to strike an affidavit.

**7.** The proposed amended Complaint alleges that the margin call was made "on or about October 16, 1987." We note that plaintiff's moving papers recite that the date was October 15, 1987. *See, e.g.,* Plaintiff's Statement of Uncontroverted Facts Pursuant to Rule 3(g) at ¶ 8.

**8.** The original complaint reads in relevant part:

> On or about October 16, 1987, Defendant Estate had a call for additional margin in order that Defendant's investment account remain in compliance with Federal regulation T, 12 C.F.R. §§ 220.1–220.130.
>
> \* \* \* \* \* \*
>
> Pursuant to 12 C.F.R. §§ 220.1–220.130, Defendant was granted an extension of time to meet the margin call until October 26, 1987.

The proposed amended complaint changes those two sentences to read:

> On or about October 16, 1987, Defendant Estate had a call for additional margin in order that Defendant's investment account remain in compliance with NYSE Rule 431 and/or the margin requirements of Broadcort Capital Corporation ("Broadcourt").
>
> \* \* \* \* \* \*
>
> Pursuant to its Customer Agreement and NYSE Rule 431, Defendant was granted an extension of time to meet the margin call until October 26, 1987.

of Nanda Reed. *See* November 11, 1988 Deposition of Nanda Reed at 141. Therefore, it is our view that plaintiff's proposed amendment will not prejudice defendant.

Finally, that defendants and the court were advised early in the briefing process that the instant motion to amend would be forthcoming is inconsistent with a finding of bad faith or undue delay on plaintiff's part. Accordingly, we grant plaintiff's motion for leave to amend the complaint pursuant to Fed.R.Civ.P. 15(a).

*Summary Judgment*

Before discussing the parties' summary judgment motions, we briefly review the legal principles relevant to such motions. Summary judgment is appropriate when, after drawing all reasonable inferences in favor of the nonmoving party, no reasonable trier of fact could find in the nonmoving party's favor. *See Lund's, Inc. v. Chemical Bank,* 870 F.2d 840, 844 (2d Cir. 1989). Conversely, if there are material factual issues which a reasonable fact-finder could resolve in favor of the nonmoving party, summary judgment is inappropriate. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). To avoid summary judgment the party against whom summary judgment is sought must come forward with specific facts indicating that there is a genuine issue for trial. *See National Union Fire Insurance Company of Pittsburgh, Pa. v. Turtur,* 892 F.2d 199, 203 (2d Cir. 1989). Summary judgment is inappropriate if the nonmoving party "generates uncertainty as to the true state of any material fact." *Id.* (quoting *Beacon Enterprises, Inc. v. Menzies,* 715 F.2d 757, 762 (2d Cir. 1983)).

Turning to the parties' substantive arguments, defendants contend that it was the negligence of plaintiff or C & S South Carolina that caused any deficiency in the Account. This argument forms the essential basis for the defendants' counterclaim and for much of their defense to plaintiff's cross-motion for partial summary judgment. Therefore, for the sake of economy we will first address defendants' counterclaim.

*Counterclaim*

■ Defendants allege that the plaintiff as defendants' broker failed to manage adequately the Account and liquidate it properly to avoid losses. Defts' Reply at 5. Essentially, defendants argue that had plaintiff liquidated the Account to cover margin calls before the October crash, no deficiency would have resulted.

It is defendants' view that any liquidation of the Account to cover margin calls should have occurred "no later than October 16, 1987." Defts' Reply at 3. According to the defendants, on October 6, 1987 the Estate purchased 17,500 shares of Quaker Oats for a total price of $910,000 and 7,000 shares of Coca Cola for a total price of $320,000 on October 8, 1987. January 25, 1989 Affidavit of Milton Braten ("Braten Affidavit") at 5. Defendants assert these purchases required that the Estate meet Regulation T margin calls of $455,000 on October 14, 1989 and $160,063 on October 16, 1987. *Id.* Defendants allege that plaintiff's failure to cover these Regulation T margin calls until after the October crash caused the Estate damage and "is one factor" illustrating plaintiff's negligence in handling the Account. Defts' Brief in Opposition at 4.

It is defendants' further contention that neither Braten nor Cornfield were asked for funds to cover margin calls between October 14, 1987 and October 16, 1987, and that neither asked plaintiff for any extensions of time to meet margin calls. Defendants' Rule 3(g) Statement at 3.

We find defendants' arguments unpersuasive. First, defendants' counterclaim, stripped of extraneous allegations, is essentially a claim for damages caused by plaintiff's alleged violation of Regulation T's requirements. It is settled in the Second Circuit that there is no private right of action under Regulation T's authorizing statute, section 7 of the Securities Exchange Act of 1934, 15 U.S.C. § 78g (1982). *See Bennett v. United States Trust Company of New York,* 770 F.2d 308, 312 (2d Cir.), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1980).

Second, even if we accept defendants' assertion that two Regulation T margin calls of $455,000 and $160,000 were due on October 14 and October 16, 1987, we fail to see the relevance of this contention. Regulation T imposes requirements on initial trades on margin. *See* 12 C.F.R. § 220.1; *see also Palmer v. Thomson & McKinnon Auchincloss, Inc.*, 474 F.Supp. 286, 289 n. 5 (D.Conn.1979) (Regulation T limits apply only to the initial purchase). Plaintiff alleges that defendants were informed of a $142,000 margin maintenance call due to falling stock prices. It is this maintenance call of $142,000 which is the basis of the instant action.[9]

Defendants raise no facts to contradict plaintiff's assertion that a margin maintenance call of $142,000 was communicated to Braten between October 14 and October 16, 1987. Indeed, defendants merely deny that any funds were requested of them between October 14th and 16th.

However, defendants' denials are contradicted by exhibits before the court. Certain October telephone conversations between defendant Braten and Ann Gibbes, the Estate's account executive for plaintiff were recorded. There is no dispute as to the authenticity of the tape recordings. *See* Defendants' 3(g) Statement at ¶ 5; Plaintiff's Brief in Support of Motion for Partial Summary Judgment ("Pltf's Brief") at 6, n. 3.

These recordings clearly reveal that on October 15, 1987 Braten was informed by Ms. Gibbes that there was a margin maintenance call of $142,054. Transcript of October 1987 Telephone Conversations Between Milton Braten, Ann Gibbes, and Nanda Reed ("Telephone Transcript") at 15. Further, the tapes clearly show that Braten was informed by Gibbes on October 16, 1987 that the $142,054 margin maintenance call was due on "Monday at the latest."[10] Telephone Transcript at 21–22. That "Monday" would have been October 19, 1987. Thus, defendants' contention that Braten was not asked to give money to cover margin calls between October 14, 1987 and October 16, 1987 is directly contradicted by the telephone transcripts of October 15, 1987 and October 16, 1987.[11]

Moreover, the telephone transcripts clearly indicate: (1) that there was no instruction by Braten to liquidate the Account prior to October 19, 1987;[12] (2) that there was no disagreement on Braten's part as to the October 19th due date for the maintenance call;[13] and (3) that on October 19th and after Braten continually represented to Gibbes that he was arranging to have a check sent to cover the margin call

---

**9.** Indeed, assertions about other Regulation T calls notwithstanding, nowhere do defendants explicitly deny that the maintenance call of $142,054 was made.

**10.** The following is taken from the telephone transcripts submitted to the court:

MR. BRATEN: Now, what is the amount on the call?
MS. GIBBES: $142,054
MR. BRATEN: $142?
MS. GIBBES: Uh-huh (affirmative)

   \*    \*    \*    \*    \*    \*

MR. BRATEN: All right. Is that a cash call or is that a security call?
MS. GIBBES: It's a cash call; it's due Monday at the latest.
MR. BRATEN: Oh, it's not necessarily been paid?
MS. GIBBES: No. Monday—it's got to be covered by Monday.
MR. BRATEN: Oh, fine. So then I can decide what I want to do leisurely today. That's what I thought it was.

Telephone Transcript at 21–22.

**11.** Moreover, we note in the telephone transcripts of October 15, 1987, that there is a reference to a Regulation T call having previously been met. Telephone Transcript at 18.

**12.** In fact after the October 19th crash Braten indicated to Ann Gibbes, his account representative, that if plaintiff could not wait for his check to cover the margin call, then it could "do what they want." Telephone Transcript at 54 and 55.

**13.** Defendants offer an exhibit dated October 15, 1987, which indicates that a maintenance call of $142,054 was due on "October 14" but changed by hand to "October 19." Braten Affidavit, Exhibit E. Defendant appears to suggest something improper about the change, and argues that had all margin calls been met on October 14th there would have been no deficit. Braten Affidavit at 6–7. However, the tapes reveal that when informed on October 15th and 16th about the maintenance call, Braten clearly chose to wait until October 19th to pay the maintenance

and that it would be arriving in a few days. *See, e.g.,* Telephone Transcript at 47; Telephone Transcript at 51; Telephone Transcript at 62; Telephone Transcript at 64–65; Telephone Transcript at 75. In fact, at one point Braten explicitly agreed to have C & S Securities request an extension on a liquidation from its clearing broker, Broadcourt. Telephone Transcript at 69.[14]

Finally, we address defendants' contention that the Estate was damaged because plaintiff failed to exercise due diligence in the performance of its agency. Defendants argue that plaintiff was the agent of the Estate for the purpose of carrying out transactions directed by Braten. They assert that plaintiff without direction from Braten waited until after the October crash to liquidate the Account when it had a duty to liquidate the Account earlier. However, defendants simply raise no facts to suggest that plaintiff was under a duty to liquidate the Account to cover the $142,000 margin maintenance call prior to the October crash. Moreover, they do not dispute plaintiff's assertion that under New York Stock Exchange Rules a dealer-broker has up to 15 business days after a margin call to collect additional money from its customer.[15] Therefore, even assuming that the maintenance call was due on October 14, 1987, which is the only specific factual assertion about this maintenance call defendants make, plaintiff had up to 15 business days to collect any additional money—long past the date of the October crash.

Therefore, for all the above reasons, we deny defendants' motion for summary judgment as to their counterclaim, and grant plaintiff's motion for summary judgment as to the counterclaim.

*Count I*

■ We next address defendants' contention that since the Account was opened with C & S South Carolina, defendants had no account with plaintiffs, C & S Securities. That being the case, defendants assert that they should not be held liable for any deficiencies in the Account.[16] Significantly, defendants do not contest that there is a deficiency in the Account.

There is no dispute that C & S South Carolina was acquired by C & S in 1986. Moreover, defendants do not dispute nor raise any facts which contradict plaintiff's assertion that the Discount Brokerage Division of C & S South Carolina was subsequently made a part of C & S Securities, a subsidiary of C & S, which in turn acquired all the rights of C & S South Carolina's Discount Brokerage Division. *See* May 11, 1989 Affidavit of Ray Fortin. Plaintiff avers that C & S South Carolina customer accounts were transferred to C & S Securities and given new account numbers unless customers indicated that wished their account closed. *See* May 15, 1989 Affidavit of Nanda Reed at 3.

Defendants present no facts which contradict plaintiff's assertion that C & S Securities succeeded to C & S South Carolina's rights.[17] Instead defendants merely deny that their C & S South Carolina account was transferred to C & S Securities with defendants' permission. Defts' Reply at 5–6. Defendants contend that there is "no evidence" that they were notified and consented to this transfer because plain-

---

call even though presumably he could have arranged for earlier payment.

**14.** The conversation is as follows:
   MS. REED: Okay. I'm going to call, right now, our clearing vendor, Broadcourt, and find out whether they can give me an extension on a liquidation.
   MR. BRATEN: Okay.

**15.** Rule 431(f)(6) of the New York Stock Exchange, 2 N.Y.S.E. Guide (CCH) ¶ 2431, reads:
   The amount of margin or "mark to market" required by any provision of this Rule shall be obtained as promptly as possible and in any event within fifteen business days from the date such deficiency occurred, unless the

Exchange has specifically granted the member organization additional time.

**16.** Under New York law allegations of unpaid balances due on an account despite reasonable demand make out a cause of action on an account. *See Rothschild Sunsystems, Inc. v. Pawlus,* 129 A.D.2d 933, 514 N.Y.S.2d 572, 572–73 (N.Y.App.Div.1987), *app. denied,* 70 N.Y.2d 610, 522 N.Y.S.2d 110, 516 N.E.2d 1223 (1987).

**17.** The C & S South Carolina Customer Agreement with defendants permitted the broker to close the customer's account and liquidate the assets in the account should the customer fail to pay any indebtedness.

tiffs have not produced a "copy of the notification." *Id.*

We find this contention disingenuous at best. Indeed, there are documents before the court which clearly indicate that the defendant Braten and his agent Cornfield knew that their account number had changed and that their account was with C & S Securities. The following are some obvious examples of this knowledge: (1) checks written by Braten's agent Cornfield to C & S Securities containing the C & S Securities account number; (2) dividend checks from C & S Securities to the Estate and Braten endorsed by Braten; (3) a March 2, 1987 customer agreement with Broadcourt, the C & S Securities clearing agent, signed by Braten and containing the C & S Securities account number; and (4) a number of C & S Securities statements addressed to defendants referring to the Account's trading activity.

Moreover, even if we were to accept defendants' naked assertions that they did not receive any notification of the acquisition of C & S South Carolina, that does not affect plaintiff's uncontested assertion that C & S Securities succeeded to C & S South Carolina's rights. Finally, and importantly, it is undisputed that the account number under which plaintiff and defendants operated in October of 1987 was 47L12162, a C & S Securities account number.[18] Therefore, defendants' suggestion that they had established no account with plaintiff is wholly without merit. Accordingly, we deny defendants' motion for summary judgment as to Count I of the Complaint. In addition, since defendants in opposition to plaintiff's motion for summary judgment as to Count I present no facts which raise an issue for trial, we grant plaintiff's motion for summary judgment as to Counts I.

**18.** The former C & S South Carolina account number was 011–035432.

**19.** We note that neither party cites to state law in regard to the majority of the common law claims. They predominantly rely on Second Circuit constructions of New York common law. Where this occurs we do not feel obliged to make an independent determination as to what state law applies and will decide them

*Count II*

Count II alleges that a debit balance of $259,664.52 was orally communicated to Braten by plaintiff to which Braten agreed and promised to pay. Defendants generally deny these allegations in their Answer. To this court's surprise, in both their summary judgment motions neither party offers any facts to indicate whether this exchange did or did not occur. In fact, in plaintiff's motion papers the only direct reference to the allegations contained in Count II, directly contradicts the allegations. In its papers plaintiff states that "[d]efendants were informed of this debit balance later that week and *Defendants refused to pay said balance.*" Pltf's Brief at 7 (emphasis added). Indeed, plaintiff's reference to deposition testimony in support of this assertion confirms the accuracy of it. In light of this concession by plaintiff, we grant defendants' motion for summary judgment as to Count II, and deny plaintiff's motion for summary judgment as to Count II.

*Count III*

■ Plaintiff bases its breach of contract claim on the Customer Agreement signed between defendants and Broadcourt Capital Corporation (the "Customer Agreement"), plaintiff's clearing broker.[19] Defendants argue that the Customer Agreement on its face is not a contract between defendants and plaintiff. Defts' Memo. at 3. It is plaintiff's view that it is a third-party beneficiary of the Customer Agreement and thus has a right of action against defendants for its breach. Pltf's Brief at 8.

Some courts have held that the relationship between an introducing broker and a clearing broker is not susceptible to a third-party beneficiary analysis. *See Ahn v. Rooney, Pace Inc.*, 624 F.Supp. 368, 370–71

under New York law. *Cf. Lehman v. Dow Jones & Co., Inc.*, 783 F.2d 285, 294 (2d Cir.1986) ("Although [plaintiff] does not concede that New York law would apply, he, like [defendant], cites only New York cases. Under these circumstances we do not feel obliged to undertake an investigation to determine whether there is any difference in the California law....").

(S.D.N.Y.1985). However, we are persuaded to the contrary by Judge Sofaer's reasoning in *Cauble v. Mabon Nugent & Co.*, 594 F.Supp. 985 (S.D.N.Y.1984). In *Cauble,* Judge Sofaer ruled that a commodities broker had third-party beneficiary status to sue on a contract executed between its customer and its clearing broker. *Id.* at 991. The contract did not explicitly grant or deny the commodities broker any rights to enforce its terms. Judge Sofaer asserted that third-party beneficiary status is conferred if a recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties. *Id.* (citing Restatement (Second) of Contracts § 302). Accordingly, he ruled that since the manner in which the account was handled demonstrated that the obligations under the contract were to be monitored and controlled by the commodities broker and not the clearing broker, and that the parties were aware of the arrangement at the time the contract was signed, this course of dealing was sufficient to confer third-party beneficiary status on the commodities broker. *Id.*

The instant agreement between Broadcourt and defendants expressly contemplates a relationship in which instructions regarding transactions in the Account are transmitted through another broker. *See* Complaint, Exhibit B at ¶ 12. We agree with Judge Sofaer that if the parties were aware at the signing of the Customer Agreement that the obligations of Broadcourt under the Customer Agreement were to be monitored and controlled by plaintiff, and the course of dealing confirms this arrangement, then plaintiff is entitled to enforce the Customer Agreement as a third-party beneficiary. While we believe that there are strong indications that this circumstance was so, since neither party has addressed this issue directly in its papers, we decline to grant summary judgment for plaintiff. Accordingly, we deny both defendants' and plaintiff's motions for summary judgment as to Count III.

*Count IV*

■ Plaintiff styles Count IV as an "alter ego" cause of action. Plaintiff alleges that Braten used the Estate Account as "a vehicle for personal investments and investments of other unknown parties for the purpose of avoiding any possible liability of himself or those parties." Pltf's Brief in Opposition at 9. Accordingly, plaintiff asserts that since Braten is the "alter ego" of the Estate, the court should disregard the entity of the Estate and hold Braten personally liable for the Estate's debts to plaintiff.

Alter ego liability is an outgrowth of the law of corporations. The doctrine relieves a complainant of the injustice that would occur if the defendant were permitted to abuse the incorporation privilege. *See St. Paul Fire and Marine Insurance Co. v. PepsiCo, Inc.*, 884 F.2d 688, 703 (2d Cir. 1989) (quoting F.J. Powell, *Parent and Subsidiary Corporations* § 13(g) at 78 (1931)). Essentially, the doctrine permits the court to disregard the corporate fiction where the corporation has been a mere shell dominated and controlled by the alleged alter ego to carry on personal business. *See Mikropul Corp. v. Desimone & Chaplin–Airtech, Inc.*, 599 F.Supp. 940, 943 (S.D.N.Y.1984).

Plaintiff, without citation to legal authority, apparently wishes this court to extend the alter ego doctrine beyond the confines of corporation law and into other areas of law such as estates. We decline to do so.

■ First, the alter ego doctrine was designed to counteract specific abuses connected to the creation of the corporate fiction. Second, in the absence of any pertinent authority we are reluctant to extend doctrines applicable in one area of state law to another. Third, there is a vast body of relevant statutory law dealing with the duties and liabilities of fiduciaries and executors as well as the liabilities of beneficiaries. This body of applicable law is unaddressed by plaintiff. Finally, we are reluctant to extend the alter ego doctrine because plaintiff's allegations that Braten invested non-Estate funds by way of the Estate's Account to avoid personal liability are also pleaded in plaintiff's fraud counts. For these reasons we dismiss Count IV as a matter of law.

*Count V*

■ Defendants move for summary judgment as to plaintiff's securities fraud claim brought pursuant to Section 10(b) of the Securities Exchange Act of 1934 (the "Act"), 15 U.S.C. § 78j(b) and Rule 10b–5 promulgated thereunder, 17 C.F.R. 240.-10b–5. The elements of a claim under these provisions are: (1) damage to plaintiff; (2) caused by reliance on defendant's misrepresentations or omissions of material facts, or on defendant's scheme to defraud; (3) made with scienter; (4) in connection with the purchase or sale of securities; and (5) furthered by defendant's use of the mails or any facility of a national securities exchange. *See Royal American Managers, Inc. v. IRC Holding Corp.,* 885 F.2d 1011, 1015 (2d Cir.1989).

Plaintiff avers that the Estate, through Braten and in furtherance of a fraudulent scheme, opened an investment account with plaintiff, made commitments for the purchase of securities in excess of the assets of the Estate and in excess of the amount the Estate could legitimately borrow, and induced plaintiff to extend credit.[20] Plaintiff further alleges that transactions were paid with the personal funds of Braten, other Braten entities or from other funds Braten received by unknown investors as part of an illegal investment company scheme. In support of these allegations plaintiff offers exhibits and deposition testimony of Braten which tend to show that Braten was depositing checks written to the Estate into other Braten corporation accounts and writing corporate checks to pay for Estate securities purchases. Pltf's Brief at 12.

Defendants move for summary judgment as to this claim on the grounds that plaintiffs failed to exercise due diligence with regard to the Account and that the requisite "in connection with the purchase or sale of securities" element is lacking in the pleading.

■ A showing of reliance under section 10(b) and Rule 10b–5 may be defeated where a defendant establishes that the plaintiff should have discovered the facts of the fraud. However, once the issue of diligence is raised by defendant, a traditional negligence standard is not applicable and the plaintiff "bears only the burden of negating its own recklessness." *Royal American,* 885 F.2d at 1010–11; *see also Manufacturers Hanover Trust v. Drysdale Securities Corporation,* 801 F.2d 13, 22 (2d Cir.), *cert. denied,* 479 U.S. 1066, 107 S.Ct. 952, 93 L.Ed.2d 1001 (1987) (plaintiff's burden of persuasion is to negate recklessness not to establish due care); *cf. Dupuy v. Dupuy,* 551 F.2d 1005, 1020 (5th Cir.) (court should ask in 10b–5 cases whether plaintiff "intentionally refused to investigate in disregard of a risk known to him or so obvious that he must be taken to have been aware of it, and so great as to make it highly probable that harm would follow"), *cert. denied,* 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977).[21]

■ Defendant, apparently not disputing plaintiff's claim that unauthorized funds may have been entered into the Account, argues that plaintiff accepted for the Account twenty third-party checks, some from Braten's agent Cornfield, totaling over $1,000,000. The Estate had a net worth of only approximately $300,000. Defts' Reply at 6. Defendants assert that circumstance should have aroused the "curiosity" of plaintiff as to "where the money was coming from." *Id.* at 6–7.

Plaintiff counters that it is a standard industry practice that checks to an account and with a correct account number go directly to the cashier for deposit into customers' accounts without scrutiny by account executives or branch managers. Pltf's Brief in Opposition at 14 (and exhibits). Plaintiff further asserts that since the Account had a good payment record, there

**20.** Plaintiffs allege Braten is liable under the Act as a "controlling person" as defined by section 20(a), 15 U.S.C. § 78t(a).

**21.** We note that *Edwards & Hanly v. Wells Fargo Securities Clearance Corp.,* 602 F.2d 478 (2d Cir.1979), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980), a case upon which defendants rely, was decided not under the recent Second Circuit recklessness standard but under the former "due care" standard.

was no reason to scrutinize it more closely than any other. Pltf's Brief in Opposition, Exhibit A at 6. As such, plaintiff contends that it was unaware of the questionable activity in the Account.

In addition, as we described earlier in discussing the counterclaim, defendants argue that plaintiff violated Regulation T by failing to liquidate the Account before October 16. *See Manufacturers Hanover*, 801 F.2d at 23 (violation of an established statutory or regulatory cognate may be proof of recklessness). However, as we also stated earlier, defendants present no facts to indicate that there was a violation of Regulation T or that a violation of Regulation T was the proximate cause of plaintiff's loss on the $142,000 maintenance call.

Obviously, questions as to the standard practice in the discount brokerage industry are also relevant to a determination of plaintiff's conduct with respect to the Account. Moreover, this factual issue must be determined in the light of the recklessness standard applicable to section 10(b) and Rule 10b–5 claims.

Defendants also argue in support of their motion that plaintiff has failed to adequately plead or raise any issues of fact to indicate that the alleged fraudulent scheme was "in connection with" the purchase or sale of securities. We disagree.

The purpose of the alleged fraudulent scheme was to allow Braten and others to purchase securities without adequate funds and avoid any personal liabilities for potential losses. Plaintiff alleges that it was defrauded into extending credit for these transactions and was thereby damaged. It was precisely this kind of "heads I win, tails you lose" scheme which the Second Circuit in *A.T. Brod & Co. v. Perlow*, 375 F.2d 393 (2d Cir.1967) found to be prohibited by the federal securities laws. In *A.T. Brod & Co.*, the Second Circuit held that an alleged scheme by defendants to place orders for securities and pay for them only if the market value had increased by the date payment was due stated a claim under § 10(b) and Rule 10b–5 of the securities laws. *Id* at 396. Judge Kaufman, writing for the panel, stated that this practice "exacerbate[d] the very evils that the securities laws were designed to prevent" by creating an artificial demand in the market. *Id.* at 397. The *A.T. Brod & Co.* panel firmly asserted that "§ 10(b) and Rule 10b–5 prohibit *all* fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception." *Id* (emphasis original).[22]

As plaintiff has raised facts which suggest that non-Estate funds were used in Account transactions and that it was not recklessly unaware of possible irregularities, we find summary judgment to be inappropriate. Accordingly, we deny defendants' summary judgment motion as to Count V.

*Count VI*

Defendants move for summary judgment as to the plaintiff's common law fraud cause of action.[23] It is defendants' view that since plaintiff deposited third-party checks to the Estate Account, this conduct is inconsistent with a claim for fraud based on the tendering of these checks by defendants. It is defendants' contention that this conduct constitutes a waiver of the fraud cause of action.

---

**22.** Although unaddressed by the parties we note that under certain circumstances a broker has standing to bring a securities law claim. *See A.T. Brod & Co., supra; Jefferies & Company, Inc. v. Arkus–Duntov*, 357 F.Supp. 1206, 1215 (S.D.N.Y.1973); *cf. American Bank & T. Co. v. Barad Shaff Securities Corp.*, 335 F.Supp. 1276, 1280 (S.D.N.Y.1972) (one who purchases for another may be a "purchaser" under § 10(b) for purposes of suit against customer who fails to reimburse). Further, the continued vitality of the approach to standing and the "in connection with" requirement as stated in *A.T. Brod & Co.*, *supra*, has been reaffirmed by the Second Circuit as recently as 1986. *See Saxe v. E.F. Hutton & Co., Inc.*, 789 F.2d 105, 109 (2d Cir.1986).

**23.** Defendants contend that South Carolina law applies to the fraud claim. Defts' Brief in Support of Motion for Summary Judgment at 9. Plaintiff's contend that New York law applies. Pltf's Brief in Opposition at 21 n. 11. We agree with plaintiff that the result is the same under either.

 To waive a fraud claim, a defrauded party must act with the full knowledge of his/her rights and of the material facts constituting the fraud. *See Bull v. Metropolitan Life Insurance Co.,* 195 S.C. 536, 12 S.E.2d 24, 26 (S.C.1940); *cf. duPont v. Perot,* 59 F.R.D. 404, 412–13 (S.D.N.Y. 1973) (under New York law when benefits of a contract are retained with knowledge of fraud, the defrauded party waives right to damages for the fraud). It is undisputed that the deposit of third-party checks into the Account was an unusual circumstance worthy of investigation. *See* May 15, 1989 Affidavit of Ronald W. Lankford at 2. However, it is our view that issues of fact remain regarding the extent to which plaintiff was aware of any improprieties involving the Account. This factual assessment requires further inquiry into the standard practices of the industry regarding the receipt of checks to discount brokerage accounts and what mechanisms, if any, are used by similar institutions such as plaintiff for preventing fraudulent account activity. In sum, we conclude whether plaintiff had knowledge of the alleged fraud and affirmed it by its own actions is a question of fact which cannot be resolved in the context of the instant motion. Therefore, we deny defendants' motion for summary judgment as to Count VI.

### Conclusion

For the reasons articulated above we:

1. deny the motion for summary judgment as to the counterclaim of defendants Milton Braten and the Estate of Bernard Braten, and grant the motion for summary judgment as to the counterclaim of plaintiff Citizen and Southern Securities Corporation;

2. deny defendants' motion for summary judgment as to Count I of the complaint, and grant plaintiff's motion for summary judgment as to Count I of the complaint;

3. grant defendants' motion for summary judgment as to Count II of the complaint, and deny plaintiff's motion for summary judgment as to Count II;

4. deny both defendants' and plaintiff's motion for summary judgment as to Count III of the complaint;

5. dismiss Count IV as a matter of law;

6. deny defendants' motion for summary judgment as to Count V and Count VI of the complaint;

6. deny plaintiff's motion to strike the affidavits of James W. Strong and John W. Brown, III;

7. grant plaintiff's motion to amend the complaint.

SO ORDERED.