**Paul E. LENHART and Betty Lenhart, Plaintiffs,**

v.

**WESTFIELD FINANCIAL CORPORATION, et al., Defendants.**

**No. 95–00282 DAE.**

United States District Court, D. Hawai'i.

Dec. 22, 1995.

Thomas T. Watts, Kemper & Watts, Honolulu, HI, for Salvatore James Mazzeo.

Leroy E. Colombe, Chun Kerr Dodd & Kaneshige, Honolulu, HI, for Ilya Perlin.

## ORDER DENYING DEFENDANT PERLIN'S MOTION TO STAY THIS ACTION AND COMPEL ARBITRATION AND GRANTING PLAINTIFFS' CROSS–MOTION FOR DETERMINATION THAT THERE IS NO BASIS FOR ARBITRATION

DAVID ALAN EZRA, District Judge.

The court heard both Defendant Perlin's Motion and Plaintiffs' Cross–Motion on December 18, 1995. Peter J. Lenhart, Esq., appeared at the hearing on behalf of Plaintiffs Paul E. Lenhart and Betty Lenhart (collectively, "Plaintiffs"); Leroy E. Colombe, Esq., appeared at the hearing on behalf of Defendant Elliot Perlin ("Perlin"). After reviewing the motions and the supporting and opposing memoranda, the court DENIES Defendant Perlin's Motion to Stay This Action and Compel Arbitration ("Perlin's Motion to Compel") and correspondingly GRANTS Plaintiffs' Cross–Motion for Determination that There is No Basis for Arbitration ("Plaintiffs' Cross–Motion").

### BACKGROUND

On December 7, 1992, Plaintiff Paul Lenhart authorized Defendants Elliot Fisher ("Fisher") and Perlin to open a securities brokerage account with Westfield Securities Corporation ("WFC"). WFC was the "introducing broker" that handled the substantive management of Plaintiffs' accounts."[1] In this case, Oppenheimer & Co., Inc. ("Oppenheimer") acted as the clearing broker by performing trades and accounting services for Plaintiffs' accounts with WFC.

As is customary for introducing brokers, Fisher and Perlin used a standard "Oppenheimer Customer Information Form" to open

Peter J. Lenhart, Makai Tower, Honolulu, HI, for Paul E. Lenhart, Betty Lenhart.

---

1. An introducing broker is generally a small broker that provides stock brokerage services and handles the substantive management of a customer's accounts. *See Kyung Sup Ahn v. Rooney, Pace Inc.,* 624 F.Supp. 368 (S.D.N.Y.1985). "It is customary in the case of smaller brokers [ ] for another entity called the 'clearing broker' to perform mechanical, recordkeeping functions relating to the clearance and settlement of various transactions in the customer accounts." *Id.*

Plaintiffs' Individual Account.[2] Paul Lenhart also signed a standard printed Oppenheimer Client Agreement form ("Client Agreement") on January 29, 1993. *See* Plaintiffs' Cross–Motion, Exhibit "C." This Agreement included an arbitration clause covering "[a]ll controversies which may arise between us[3] concerning any transaction or the construction, performance or breach of this or any other agreement between us, whether entered into prior, on or subsequent to the date hereof." *Id.* Furthermore, the Client Agreement has a choice of law provision that states: "This agreement and its enforcement shall be governed by the laws of the State of New York without giving effect to the choice of law or conflict of laws provisions thereof."[4] *Id.*

On February 7, 1993, Plaintiff Betty Lenhart executed the same Client Agreement by signing her name underneath her husband's. *Id.* The Client Agreement executed by the Lenharts is a basic agreement between the customer and the clearing broker. Interpretation of this Client Agreement is central to resolving the instant motions.

On August 13, 1993, Plaintiffs signed Oppenheimer's Correspondent Account Disclosure Statement ("Disclosure Statement") which outlined the responsibilities of both Oppenheimer and WFC under the Clearing Agreement. *See* Plaintiffs' Cross–Motion, Exhibit "B." The Disclosure Statement specifically states: (a) WFC is "independent of Oppenheimer," (b) Oppenheimer has no involvement and does not assume responsibility for the tasks assumed by WFC under the Clearing Agreement, and (c) "OPPENHEIMER DOES NOT CONTROL, AUDIT OR OTHERWISE SUPERVISE THE AC-TIVITIES OF WFC OR ITS REGISTERED REPRESENTATIVES OR EMPLOYEES. OPPENHEIMER DOES NOT VERIFY INFORMATION PROVIDED BY WFC REGARDING YOUR ACCOUNT OR TRANSACTIONS PROCESSED FOR YOUR ACCOUNT NOR UNDERTAKE RESPONSIBILITY FOR REVIEWING THE APPROPRIATENESS OF TRANSACTIONS ENTERED BY WFC ON YOUR BEHALF." *Id.* (emphasis in the original).

In addition to Plaintiffs' Individual Account, Plaintiffs contend that Fisher and Perlin fraudulently opened two other accounts without their knowledge, authorization or approval. Plaintiffs allege that: (1) on or about April 5, 1993, Fisher and Perlin opened Account No. 619–11482 under the fictitious name Ann[e] Lenhart[5] who is purported to live at 2608 N. Dallas Drive, La Marque, Texas 77567–5109 ("Ann Lenhart Account"), and (2) on or about July 14, 1993, Fisher and Perlin opened Account No. 619–13088, a joint account under the name of Plaintiffs (using the same fictitious address, i.e. "311 Annette Court, Garland, Texas 75044," used by Defendants to open Plaintiffs' Individual Account). *See* Plaintiffs' Cross–Motion, Exhibits "E"—"K." Plaintiffs maintain that these two unauthorized accounts contain forged or fraudulent signatures and that Defendants failed to provide them with copies of Oppenheimer's Customer Information Sheet, Disclosure Statement, or Client Agreement for these accounts. *See* Plaintiffs' Cross–Motion, at 5–6. Plaintiffs also accused Defendants of other misconduct such as unauthorized trading, churning, selling securities without proper registration and fraud.

---

**2.** Paul Lenhart claims that in opening this individual account, Fisher and Perlin apparently ignored his instructions to open a joint, non-discretionary, stock brokerage account. *See* Plaintiffs' Cross–Motion, Affidavit of Paul Lenhart, at 2.

**3.** The Client Agreement states: "Throughout this agreement, 'I,' 'me,' and 'us' refer to the client and all others who are legally obligated on this account. 'You' and 'your' refer to Oppenheimer, its subsidiaries, affiliates, officers, directors, agents, and/or employees." *See* Plaintiffs' Cross–Motion, Exhibit "C."

**4.** It appears that Plaintiffs and Perlin agree that New York law governs the provisions and enforcement of the arbitration agreement. Hence, for the purposes of the instant motions, this court will analyze the enforceability of the arbitration clause in the Client Agreement under New York law.

**5.** The correspondence concerning the account refers to Ann Lenhart as Paul Lenhart's ex-wife. However, Paul Lenhart has been married only once, to his wife named Betty. *See* Preliminary Order to Cease and Desist, attached as Exhibit "K" to Plaintiffs' Cross–Motion for Determination that There is No Basis for Arbitration, at 8.

On August 19, 1994, Plaintiffs entered into a settlement agreement with WFC ("Settlement Agreement") where WFC agreed to pay Plaintiffs $105,000 in return for Plaintiffs' release of claims. Plaintiffs contend that WFC breached the Settlement Agreement, and under that agreement, it is entitled to litigate ensuing disputes. Specifically, Plaintiffs claim that WFC violated ¶ 13 of the agreement which states: "Westfield hereby represents and warrants to Plaintiffs that it has no intention, as of the date of this Letter Agreement of filing bankruptcy, of dissolving its corporate charter, or selling all or substantially all of its assets, or of merging or consolidating with any other business." *See* Plaintiffs' Cross–Motion, Exhibit "J," at 6. Plaintiffs maintain that approximately two months after signing the Settlement Agreement, they learned that WFC had sold all, or substantially all, of its assets including its customer accounts to Defendant Robert Todd Financial Corporation ("RTF") and that WFC had informed the Securities and Exchange Commission ("SEC") and National Association of Securities Dealers ("NASD") of its surrender of its broker-dealer registration. Additionally, Plaintiffs claim that WFC has only paid $25,000 of the $105,000 settlement amount and has failed to pay monthly installments since November 1, 1994. *See* Plaintiffs' Cross–Motion, at 8. The Settlement Agreement provides for all disputes between Defendants and Plaintiffs to be settled and resolved by litigation in the State of Hawaii.[6] *See* Plaintiffs' Cross–Motion, Exhibit "J," at 5.

The State of Hawaii Commissioner of Securities issued a Preliminary Order to Cease and Desist on November 28, 1994 and a Final Order on January 24, 1995 against Defendants WFC, Paul Alessandrini, Salvatore

Mazzeo, Fisher, and Perlin along with nine other salespersons for employing devices, schemes, or artifices to defraud more than 30 Hawaii residents, in violation of the Hawaii Uniform Securities Act (Hawaii Revised Statutes, Chapter 485). *See* Plaintiffs' Cross–Motion, Exhibit "K," at 6–10.

On April 13, 1995, Plaintiffs filed their own suit against Defendants alleging violations of several Federal Securities Laws including:

15 U.S.C. § 78j(b) and Rule 10(b)(5) promulgated thereunder; 15 U.S.C. § 77q(a); 15 U.S.C. § 78; 15 U.S.C. § 78o(c)(1) and Rule 15(c)(1)–(2) promulgated thereunder; the Rules of the National Association of Securities Dealers, Inc. ("NASD") and the National Association of Securities Dealers Automatic Quotation System ("NASDAQ").

*See* Plaintiffs' Complaint, at 8. Plaintiffs' 70–page Complaint also alleges violations of many Hawaii blue-sky laws including, but not limited to:

Haw.Rev.Stat. § 485–14 (securities transactions by an unregistered dealer); Haw. Rev.Stat. § 485–15(7) (fraud and unethical practices); Haw.Rev.Stat. § 485–15(10) (failure to supervise); Haw.Rev.Stat. § 485–15(11) and Hawaii Administrative Rules ("H.A.R.") § 16–38–7(b)(22) (unworthiness to transact business of a securities dealer in Hawaii); Haw.Rev.Stat. § 485–24 (failure to provide customer a copy of the prospectus before completion of sale of securities); Haw.Rev.Stat. § 485–8 and H.A.R. § 16–38–8 (failure to register securities for distribution in Hawaii prior to sale).

*Id.* at 36–44. Finally, Plaintiffs set forth in their Complaint as additional claims, the following:

the parties hereto therefore agree to litigate any dispute and/or claim relating to, involving, or arising out of this Letter Agreement, the Release, and/or the Lenhart Complaint in the State of Hawaii. Westfield [WFC] hereby further agrees to, does hereby consent to, personal jurisdiction by, and venue in, the State and Federal courts located in Honolulu, Hawaii. Any waiver of any breach of this Letter Agreement shall not be deemed by that party to be a waiver of any other breach of this Letter Agreement.

*See* Plaintiffs' Cross–Motion, Exhibit "J;" at 5.

---

**6.** Paragraph 9 of the Settlement Agreement states:

This Letter Agreement and the Release shall be governed by and shall be interpreted, construed and enforced in accordance with Hawaii law. In the event of any litigation involving the interpretation and/or enforcement of this Letter Agreement of any documents referred to herein, or in the event You pursue any of your claims relating to the Lenhart Complaint against Westfield [WFC], all parties hereto agree that the Courts of the State of Hawaii shall have exclusive jurisdiction and

Common law fraud, gross negligence, misrepresentation, violation of NASD Exchange Rules, breach of brokerage agreement, breach of contract, breach of settlement agreement, fraudulent conveyance, misappropriation of customer funds, churning of brokerage account, unsuitability, breach of shingle doctrine, breach of fiduciary duty, negligence, RICO, 18 U.S.C. § 1964(c) violations, Unfair and Deceptive Trade Practices, infliction of emotional distress, and contractual disappointment.

*Id.* at 44–69.

On October 25, 1995, Defendant Perlin filed the present Motion to Stay this Action and to Compel Plaintiffs to Arbitrate their Claims. Perlin relies on the Federal Arbitration Act (9 U.S.C. § 4) and three federal cases [7] in which courts have compelled arbitration in instances where introducing brokers were found to be agents or third party beneficiaries under customer-clearing broker agreements. *See Nesslage v. York Securities, Inc.*, 823 F.2d 231 (8th Cir.1987); *Cauble v. Mabon Nugent & Co.*, 594 F.Supp. 985 (S.D.N.Y.1984); and *Okcuoglu v. Hess, Grant & Co., Inc.*, 580 F.Supp. 749 (E.D.Pa. 1984).

On November 30, 1995, Plaintiffs filed a Cross–Motion for Determination that There is No Basis for Arbitration. In their motion, Plaintiffs contend that: (a) neither WFC nor Perlin can assert the benefits of the Client Agreement because they are not agents or third party beneficiaries, and (b) by entering into the Settlement Agreement, WFC surrendered any rights it might have had to arbitrate this dispute.[8]

### STANDARD OF REVIEW

The Federal Arbitration Act provides:

A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under Title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.... The Court shall hear the parties, and upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue, the court shall make an order directing the parties to proceed in arbitration in accordance with the terms of the agreement.

9 U.S.C.A. § 4 (West 1970).

 There is a strong federal policy favoring arbitration as a means for dispute resolution. *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226, 107 S.Ct. 2332, 2337, 96 L.Ed.2d 185 (1987); *Moses H. Cone Memorial Hospital v. Mercury Construction Corp.*, 460 U.S. 1, 24, 103 S.Ct. 927, 941, 74 L.Ed.2d 765 (1983). This policy requires that courts "rigorously enforce agreements to arbitrate." *Dean Witter Reynolds, Inc. v. Byrd,* 470 U.S. 213, 221, 105 S.Ct. 1238, 1242, 84 L.Ed.2d 158 (1985). Despite this policy mandate, however, a court may not compel arbitration unless the parties have explicitly agreed to arbitrate their disputes. *Meva International Ltd. v. Family Dollar Services,* 1995 WL 694490, at *3 (S.D.N.Y. Nov. 22, 1995).

 When considering a motion to compel arbitration, a court must first determine whether an agreement to arbitrate exists and then decide whether the dispute before it arises under the agreement and is arbitrable. *Id.* at *2 (citing *Cook Chocolate Co. v. Salomon, Inc.*, 684 F.Supp. 1177, 1181 (S.D.N.Y. 1988)); *Progressive Casualty Ins. Co. v. C.A. Reaseguradora Nacional De Venezuela,* 991 F.2d 42, 45 (2d Cir.1993). In making such determinations, the court must apply ordinary contract principles. *Conway v. Icahn & Co.*, 787 F.Supp. 340, 344 (S.D.N.Y.1990) (*"Conway I"*); *Kyung Sup Ahn v. Rooney, Pace Inc.*, 624 F.Supp. 368, 369 (S.D.N.Y. 1985). Because arbitration is a matter of

---

**7.** Of the cases Perlin cites, only one of them is a decision from a New York federal court.

**8.** In the Settlement Agreement, WFC agreed to litigate any dispute and/or claim involving or arising out of the Settlement Agreement, the Release, or the Lenhart Complaint. *See* Plaintiffs' Cross–Motion, Exhibit "J," at 5.

contract, a party cannot be required to submit to arbitration a dispute with a party with whom it has not agreed to arbitrate. *Id.* at 343–44 (quoting *Kelly v. Robert Ainbinder & Co.,* Fed.Sec.L.Rep. (CCH) ¶ 94,963; 1990 WL 26809 (S.D.N.Y. March 8, 1990)); *see also Continental Group, Inc. v. NPS Communications, Inc.,* 873 F.2d 613, 617 (2d Cir.1989). In New York, there is no requirement that the arbitration agreement be signed by all parties; however, there must be some proof that the parties have agreed to arbitrate. *See Lester v. Basner,* 676 F.Supp. 481, 483 (S.D.N.Y.1987).

## DISCUSSION

I. WFC's Rights Under the Client Agreement

The central issue before this court is whether Perlin can invoke the arbitration clause in the Client Agreement between Plaintiffs and Oppenheimer.[9] In limited circumstances, federal courts have allowed non-signatory, introducing brokers to enforce the Arbitration clause in a customer-clearing broker agreement where the introducing broker demonstrated that it was an agent or a third party beneficiary. However, this case does not present one of those limited circumstances, because as the court finds below, WFC does not meet the criteria for agency or third party beneficiary status.

### A. *Agency Theory*

An agency relationship is based on the right of control between a principal and agent. In *Ahn,* the court states:

Agency is a fiduciary relationship resulting from a manifestation of consent by one person (the principal) to another (the agent) that the other shall act in his behalf and subject to his control, together with consent by the other to so act.... The element of subservience is essential, for there can be no agency relationship where

the alleged principal holds no right of control over the alleged agent.

624 F.Supp. at 370 (internal citations omitted).

Perlin cites *Okcuoglu,* 580 F.Supp. 749 (E.D.Pa.1984) for the proposition that the introducing broker is entitled to enforce the arbitration provision in the customer-clearing broker agreement based on agency theory. In *Okcuoglu,* the court reasoned that by approving plaintiffs for options trading through the clearing broker ("Pershing"), the introducing broker acted as a disclosed agent for Pershing. *Id.* at 751.

In contrast, Plaintiffs cite the decision in *Ahn,* 624 F.Supp. at 370, to demonstrate that an agency relationship does not exist in ordinary securities accounts. The facts in the instant case are more analogous to the circumstances present in *Ahn,* than to those in *Okcuoglu.* In *Ahn,* the court found that the introducing broker ("Rooney, Pace") and the clearing broker ("Bear Sterns") were independent entities with respect to their handling of Ahn's non-margin, non-option securities accounts. *Id.* The court held that there was no principal-agent relationship between Bear Sterns and Rooney, Pace in that case because: (1) Bear Sterns had expressly disavowed in its customer agreement any responsibility or liability for the acts of the introducing broker, and (2) the requisite elements of consent and control by the principal were missing from the relationship. *Id.* at 371.

The New York courts have approved the *Ahn* reasoning in affirming that the standard relationship between introducing brokers and clearing brokers does not support the agency theory. *See Conway I,* 787 F.Supp. at 345 (The court relied on the clearing broker's disclaimer of responsibility in the Clearing Agreement to find no right of control and no agency relationship); *Lester,* 676 F.Supp. at 481 (Introducing broker cannot rely on agency theory to enforce the arbitration provision where there is an express disclaimer of agen-

---

9. Perlin asserts his claim as an employee of WFC. Perlin argues that as the introducing broker, WFC is entitled to the benefits of the customer-clearing broker agreement. The parties agree that if WFC has the right to assert arbitration, Perlin can assert the same rights, as their registered agent or employee. *See Scher v. Bear*

*Stearns & Co.,* 723 F.Supp. 211 (S.D.N.Y.1989). Since the case law generally refers to the introducing broker by the company's name, the court will analyze Perlin's claim by determining whether WFC is entitled to enforce the arbitration clause with the understanding that Perlin has the same rights.

cy theory coupled with case law establishing the separateness of the introducing and clearing brokers); *McPheeters v. McGinn, Smith and Co., Inc.*, 953 F.2d 771, 773 (2d Cir.1992) ("It is nowhere stated that SSC [clearing broker] acts as [introducing broker] McGinn, Smith's agent in entering into the Agreement generally, and we refuse to read such a provision into the document.").

■ Here, the court finds the *Ahn* line of cases controlling. None of the Oppenheimer forms submitted to the court indicate that Oppenheimer was acting as WFC's agent, or vice versa. In fact, Oppenheimer expressly disavows liability or responsibility for any acts or omissions of WFC as the introducing broker. *See* Plaintiffs' Cross–Motion, Exhibit "B" and "D." Furthermore, the court finds that Oppenheimer lacked the requisite control over WFC to sustain a principal-agent relationship.[10] WFC and Oppenheimer are completely separate entities engaged in an independent business relationship. Oppenheimer's only role in this relationship is to provide the "execution, clearing and book-keeping of transactions" in Plaintiffs' accounts. *See* Client Agreement, attached to Plaintiffs' Cross–Motion, Exhibit "D." The absence of the right to control is determinative in this case. The court finds that Perlin cannot use agency theory to enforce the arbitration provision in the Client Agreement.

## B. *Third Party Beneficiary*

■ Alternatively, Perlin appears to argue that WFC is entitled to enforce the arbitration provision as a third party beneficiary of the Client Agreement. A party may enforce a contract as a third party beneficiary "only if the parties to the contract intended to

confer a benefit on him when contracting; it is not enough that some benefit incidental to the performance of the contract may accrue to him." *Lester*, 676 F.Supp. at 484 (quoting *Vazman v. Fidelity Int'l Bank*, 418 F.Supp. 1084, 1086 (S.D.N.Y.1976)); *see also Ahn*, 624 F.Supp. at 371. The court must determine whether Plaintiffs and Oppenheimer intended to benefit WFC and its employees in signing the Client Agreement.

■ Perlin urges the court to follow the holding in *Cauble* where the court found that although Mabon (introducing broker) was not a party to the customer agreement, he was entitled to enforce the provisions of the agreement as a third party beneficiary. 594 F.Supp. at 991; *see also Nesslage*, 823 F.2d at 233 (the Eighth Circuit relied on the holdings in *Cauble* and *Okcuoglu* to find that the introducing broker could enforce the margin agreement as a third party beneficiary *and* as the disclosed agent of the clearing broker).[11] In *Cauble*, the court held that Mabon's extensive involvement in the margin trades demonstrated that he was an intended third party beneficiary. *Id.* at 992. Specifically, the court noted that Mabon's supervisory powers over the Cauble account, his authority to collect margin payments for the clearing broker, and his right to liquidate, without demand or notice, for failure to maintain adequate margin evidenced his central position in the customer-broker relationship and gave him the authority to assert the arbitration provision as a third party beneficiary of the contract. *Id.*

Plaintiffs argue that WFC was not intended to be a third party beneficiary of the Client Agreement. Plaintiffs maintain that

---

10. The Disclosure Statement states: OPPEN-HEIMER DOES NOT CONTROL, AUDIT OR OTHERWISE SUPERVISE THE ACTIVITIES OF WFC OR ITS REGISTERED REPRESENTATIVES OR EMPLOYEES. OPPENHEIMER DOES NOT VERIFY INFORMATION PROVIDED BY WFC REGARDING YOUR ACCOUNT OR TRANSACTIONS PROCESSED FOR YOUR ACCOUNT NOR UNDERTAKE RESPONSIBILITY FOR REVIEWING THE APPROPRIATENESS OF TRANSACTIONS ENTERED BY WFC ON YOUR BEHALF." *See* Plaintiffs' Cross–Motion, Exhibit "B" (emphasis in the original).

11. Perlin also cites *Citizens & Southern Securities Corp. v. Braten*, 733 F.Supp. 655 (S.D.N.Y.1990) in an attempt to show that there are two directly-conflicting lines of cases on whether an introducing broker is a third party beneficiary of the customer-clearing broker contract. The discussion of third party beneficiaries in *Braten* is clearly dicta. The court declined summary judgment on that issue because the parties failed to address this argument in their papers. *Id.* at 665. Even including the *Braten* decision, however, the court finds that support for Judge Sofaer's proposition in *Cauble* (the introducing broker is a third party beneficiary of the customer agreement) is limited.

the WFC is an incidental beneficiary that does not have rights to assert the benefits of the contract because: (a) the Client Agreement is silent as to whether the terms of the contract apply to WFC, and (b) there is no extrinsic evidence to indicate that WFC was intended to be a third party beneficiary of the contract. *See Lester,* 676 F.Supp. at 485; *Conway I,* 787 F.Supp. at 345; *Ahn,* 624 F.Supp. at 371.

Additionally, Plaintiffs distinguish *Cauble* on the facts. The customers in *Cauble* were engaged in margin trading. 594 F.Supp. at 991. These accounts are significantly different than the non-margin, non-option, stock brokerage accounts at issue in this case. Plaintiffs note that the introducing broker plays a greater role in margin trading accounts like the one in *Cauble.* Since the threshold for approving margin (and options) accounts is more stringent, the introducing broker, by necessity, acts as an agent for the clearing broker. The introducing broker is responsible for determining the customer's ability to meet margin calls and to comply with the clearing broker's policies and federal regulations governing margin trading. Generally, in margin accounts, the clearing broker loans the customer money secured by securities held in the customer's account. For these accounts, the introducing broker often agrees to monitor the customer's account, make margin calls and liquidate securities in the customer's account when necessary (on behalf of the clearing broker). Plaintiffs argue that the symbiotic relationship between the introducing and clearing brokers that may conceivably support either an agency or third party beneficiary theory in margin or options trading is absent in non-margin, non-options securities accounts as the one implicated here. The court finds Plaintiffs' arguments persuasive.

Here, there is no evidence that WFC was intended to be a third party beneficiary of the Client Agreement. First, WFC is not mentioned by name or function in the Client Agreement.[12] Second, the court finds that Oppenheimer liability disclaimers in both the Client Agreement and the Disclosure Statement underscore Oppenheimer's intention to maintain separateness from WFC. It is obvious from the documents and the surrounding circumstances that Plaintiffs and Oppenheimer entered into the Client Agreement for their own mutual benefit, not for the purpose of conferring a benefit upon WFC and its employees. *See McPheeters,* 953 F.2d at 773. Furthermore, WFC fails to provide any extrinsic evidence which shows the signatory parties intended to specifically benefit WFC. *See Conway v. Icahn & Co., Inc.,* 16 F.3d 504, 509 (2d Cir.1994) ("*Conway II*").[13]

Lastly, the court agrees with Plaintiffs that the holding in *Cauble,* 594 F.Supp. at 991, can be distinguished here because of the significant differences in the type of brokerage transactions. Here, WFC did not assume the same type of monetary liability or active monitoring responsibility as the introducing broker in *Cauble* and therefore is not entitled to the same third party beneficiary status.

For the above reasons, the court finds that WFC is an incidental beneficiary without any rights under the Client Agreement. Accordingly, the court finds that Perlin has no standing to assert any rights under the contract and declines Perlin's request to compel arbitration.

## II. WFC's Settlement Agreement

Having found that Perlin and WFC are not entitled to enforce the arbitration provision

---

**12.** In paragraph 19, the Client Agreement lists categories of people that are bound by this Agreement. Again the introducing broker and its employees are conspicuously missing from this list. *See* Plaintiffs' Cross–Motion, Exhibit "D." It would have been easy for Oppenheimer to include WFC in ¶ 19 if the Client Agreement was intended to bind the introducing broker. Hence, the court agrees with Plaintiffs that "omission of the defendants from the clause [or contract] allowing arbitration and as signatories should be regarded as purposeful." *See Mowbray v. Mose-*

*ley, Hallgarten, Estabrook, and Weeden,* 795 F.2d 1111 (1st Cir.1986).

**13.** In *Conway II,* the court held that there is no evidence that the clearing broker intended to confer a benefit upon the introducing broker. 16 F.3d at 509. The court noted that it would have been a simple matter to include the introducing broker in the customer agreement or to enter into a separate agreement that included such provisions. *Id.*

under the Client Agreement, there is no need to interpret the effect of the subsequent Settlement Agreement between Plaintiffs and WFC as an alternative basis for Plaintiffs' Cross–Motion.

*CONCLUSION*

For the reasons stated above, the court DENIES Defendant Perlin's Motion to Stay This Action and Compel Arbitration and GRANTS Plaintiffs' Cross–Motion for Determination that There is No Basis for Arbitration.

IT IS SO ORDERED.