**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

FRANKIE A. ARRANTS; DANETTE F.
ARRANTS,
<u>Plaintiffs-Appellees,</u>

v.

ELLSWORTH ALLEN BUCK, JR.;
GEORGE E. HUBBARD,                                    No. 93-1651
<u>Defendants-Appellants,</u>

and

F. N. WOLF & COMPANY,
INCORPORATED,
<u>Defendant.</u>

ERNEST T. COLTRAIN; BETTY P.
COLTRAIN,
<u>Plaintiffs-Appellees,</u>

v.

ELLSWORTH ALLEN BUCK, JR.;
GEORGE E. HUBBARD,                                    No. 93-1658
<u>Defendants-Appellants,</u>

and

F. N. WOLF & COMPANY,
INCORPORATED,
<u>Defendant.</u>

Appeals from the United States District Court
for the Eastern District of Virginia, at Norfolk.
J. Calvitt Clarke, Jr., District Judge.
(CA-93-45, CA-93-127-2)

Argued: April 12, 1994

Decided: December 4, 1997

Before WILLIAMS and MICHAEL, Circuit Judges, and
WARD, Senior United States District Judge for the
Middle District of North Carolina, sitting by designation.

_____

Affirmed and remanded by published opinion. Judge Michael wrote
the opinion, in which Judge Williams and Senior Judge Ward joined.

_____

**COUNSEL**

**ARGUED:** James Christopher Cosby, MALONEY, YEATTS &
BARR, Richmond, Virginia, for Appellants. William Edgar Spivey,
KAUFMAN & CANOLES, Norfolk, Virginia, for Appellees. **ON
BRIEF:** John S. Barr, Daniel A. Gecker, Steven S. Biss, MALONEY,
YEATTS & BARR, Richmond, Virginia, for Appellants. Jonathan L.
Thorton, KAUFMAN & CANOLES, Norfolk, Virginia, for Appel-
lees.

_____

**OPINION**

MICHAEL, Circuit Judge:

This appeal involves the subject of arbitration. The matter began
when the brokerage firm of F. N. Wolf & Co., Inc. (F. N. Wolf or
Wolf) and two of its employees, Ellsworth A. Buck, Jr. and George
E. Hubbard, were sued in two cases by four customers for securities
fraud. There were immediate motions to compel arbitration. Wolf, the
introducing broker, and its employees sought to invoke the arbitration
clause in an agreement to which Wolf was not a party, that is, the
agreement between the customers and the clearing broker. The district
court denied arbitration, and Wolf and its employees appealed. We
now join the many federal courts which (aside from two limited

2

exceptions not relevant here) do not allow an introducing broker to invoke the clearing broker's arbitration clause. F. N. Wolf is no longer a party in this case, so we affirm the district court's denial of arbitration to its employees, Buck and Hubbard.

I.

After their broker, F. N. Wolf, placed them in allegedly risky stocks that lost value, Frankie and Danette Arrants and Ernest and Betty Coltrain (in separate cases) sued F. N. Wolf; Buck, their account executive; and Hubbard, Buck's supervisor. **1** The main counts of the complaints assert violations of federal securities law.

The Arrantses are high school graduates who are self-employed in the logging and trucking business. Mr. Coltrain works in the maintenance department of a lumber company. Neither the Arrantses nor the Coltrains had any prior experience in stock market investment. According to the complaints, Buck's "high-pressure telephone calls" convinced the Arrantses in 1989 and the Coltrains in 1992 to open securities accounts with F. N. Wolf. The customers claim that Buck and F. N. Wolf convinced them to buy high risk, speculative stocks that rapidly declined in price and were unsuitable to their investment needs. The Arrantses claim to have lost about $52,000 and the Coltrains about $29,000. They allege, among other things, misrepresentations and omissions in violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and SEC Rule 10b-5, 17 C.F.R. § 240.10b-5.

After the complaints were filed, F. N. Wolf, Buck, and Hubbard moved in each case to compel arbitration under the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. The movants sought to take advantage of an arbitration clause contained in the account agreements between the customers and the clearing broker, Prudential Securities Incorporated (Prudential).

The facts governing the arbitration issue are undisputed, and we begin our discussion by explaining why Prudential is in the picture.

_____

**1** We sometimes refer to the Arrantses and the Coltrains as "the customers."

3

F. N. Wolf engaged Prudential to provide certain clearing functions for the accounts of Wolf's customers. In industry jargon F. N. Wolf is the "introducing broker" and Prudential is the "clearing broker."

The clearing agreement between F. N. Wolf and Prudential is not in the record, but the basic division of their responsibilities for customer accounts is clear. F. N. Wolf, as is universally the case with introducing brokers, "retain[ed] all functions that relate to direct personal customer contacts, such as soliciting customer accounts, . . . making investment recommendations to customers, and accepting their orders for the purchase or sale of securities." Henry F. Minnerop, <u>The Role and Regulation of Clearing Brokers</u>, 48 Bus. Law. 841, 843 (1993). Prudential performed "cashiering and processing functions" for the accounts introduced by F. N. Wolf. Among other things, Prudential kept books and records reflecting transactions in the accounts, maintained funds and securities, and prepared (and mailed to the customers) confirmations and monthly statements.

After the Arrantses and the Coltrains agreed to open accounts with F. N. Wolf, each couple received a letter from that firm asking that they sign and return certain documents "need[ed] to support" their accounts with Wolf. One of the documents was a joint account agreement (Prudential Agreement) bearing Prudential's name in large bold print at the top.[2] The name F. N. Wolf did not appear anywhere in the agreements. There were some boxes filled in near the top of both documents. On both, "EWP" was written under "Branch" and "B5" was written under the letters "FA." The "Account Number" was filled in on both agreements, "015541" for the Arrantses and "024931" for the Coltrains. It was later revealed that "EWP" was the F. N. Wolf branch office, "B5" was the F. N. Wolf account executive (Buck) for each account, and the numbers were the customers' account numbers at F. N. Wolf. It is apparent from the record that the Arrantses and the Coltrains did not know the meaning of these codes and numbers when they signed the agreements.

_____

[2] The agreement received by the Arrantses bore the name "Prudential-Bache Securities," and the one received by the Coltrains said "Prudential Securities."

4

When the Coltrains received the letter from F. N. Wolf enclosing the agreement with Prudential's name at the top, Mr. Coltrain telephoned Buck, his account executive. Buck "explained to [him] that [Prudential] was a clearinghouse broker performing certain paperwork functions for [F. N. Wolf] and that the `Joint Account Agreement' was something Prudential required be signed in order for Prudential to perform such services." The Coltrains then signed the Prudential Agreement and returned it to F. N. Wolf. The Arrantses also signed and returned the agreement.

Sometime after executing the Prudential Agreements, the Arrantses and Coltrains received from Prudential a Correspondent Allocation of Responsibility Letter. The letter began with the greeting, "Dear Client," and summarized its message in the first substantive paragraph as follows: "[Prudential] is not your Broker.[Prudential] is your Broker's clearing firm. As such, [Prudential] handles the back office, or clearing functions for your Broker and, for this purpose only, [Prudential] has opened an account in your name."

The Prudential Agreements executed by the Arrantses and the Coltrains contain the same key sentence in the arbitration provision:

> The undersigned [customer] agrees, and by carrying an account for the undersigned you agree,[3] all controversies which may arise between us concerning any transaction or the construction, performance or breach of this or any other agreement between us, whether entered into prior, on or subsequent to the date hereof, shall be determined by arbitration.

It is this clause that F. N. Wolf and its employees sought to invoke in their motions to compel arbitration.

After considering the undisputed facts and the case law bearing on the arbitration issue, the district court denied the motions to arbitrate, concluding that "Wolf is not identified with reasonable certainty in

_____

[3] A Prudential vice president acknowledged in her affidavit that Prudential, as clearing broker, "carr[ies] accounts . . . for the customers" of the introducing broker.

5

the agreement the [customers] signed containing the arbitration provision." Coltrain v. F. N. Wolf & Co., 818 F. Supp. 163, 164 (E.D. Va. 1993); Arrants v. F. N. Wolf & Co., Civ. A. No. 2:93cv45 (E.D. Va. Apr. 9, 1993).**4** F. N. Wolf, Buck, and Hubbard appealed from this determination in each case, and the cases were consolidated.

Shortly after we heard oral argument, F. N. Wolf filed a petition under Chapter 11 of the Bankruptcy Code. We then stayed further proceedings in this appeal pending action in the bankruptcy case. The bankruptcy court ultimately entered a confirmation order that results in the discharge of the claims asserted here against F. N. Wolf. As a result, we have entered an order dismissing F. N. Wolf as a party to this appeal. We are now free to decide the appeal insofar as it is pressed by the two remaining parties, Buck and Hubbard, who were denied arbitration.

II.

An arbitration clause in a "contract evidencing a transaction involving commerce . . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This provision in the Federal Arbitration Act "manifest[s] Congress's `liberal federal policy favoring arbitration agreements.'" Glass v. Kidder Peabody & Co., 114 F.3d 446, 451 (4th Cir. 1997) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24-27 (1983)). In keeping with this policy, we have said that arbitration "`should not be denied unless it may be said with positive assurance that the arbitration[agreement] is not susceptible of an interpretation that covers the asserted dispute.'" Peoples Sec. Life Ins. Co. v. Monumental Life Ins. Co., 867 F.2d 809, 812 (4th Cir. 1989) (quoting United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582-83 (1960)).

Even though arbitration has a favored place, there still must be an underlying agreement between the parties to arbitrate. See Adamovic v. Metme Corp., 961 F.2d 652, 654 (7th Cir. 1992) (stating that "the federal policy favoring arbitration does not give[courts] license to

_____

**4** Because the orders denying arbitration are substantially identical, we hereafter cite only the published Coltrain order.

compel arbitration absent an agreement to do so." (citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 626 (1985))). Courts decide whether there is an agreement to arbitrate according to common law principles of contract law. See Whiteside v. Teltech Corp., 940 F.2d 99, 101 (4th Cir. 1991).

In the case before us, there is no question that the arbitration clause would be valid and enforceable as between the customers and Prudential, the clearing broker. Indeed, Prudential's reason for requiring an arbitration provision is obvious: clearing brokers are also vulnerable to suit. Thus, Prudential followed the common industry practice of requiring the customers to sign a client agreement directly with it. See Henry F. Minnerop, The Role and Regulation of Clearing Brokers, 48 Bus. Law. 841, 864 (1993).

Of course, Prudential has not been sued here, so it does not seek arbitration. Instead, it is the introducing broker, F. N. Wolf, and its employees, Buck and Hubbard, who have argued that the customers were bound to arbitrate with them under the Prudential Agreement. As noted, F. N. Wolf is no longer a party, and only Buck and Hubbard remain as defendants and appellants. Wolf's absence does not affect our inquiry, however. The allegations against Buck and Hubbard arose out of their actions concerning the customers' accounts at F. N. Wolf. Thus, if F. N. Wolf had the right to compel arbitration under the Prudential Agreement, Buck and Hubbard can enforce the same right as employees and disclosed agents of F. N. Wolf. See Scher v. Bear Stearns & Co., 723 F. Supp. 211, 216 (S.D.N.Y. 1989); Lenhart v. Westfield Fin. Corp., 909 F. Supp. 744, 749 n.9 (D. Haw. 1995). We will therefore analyze Buck and Hubbard's situation by determining whether F. N. Wolf would be entitled to enforce the arbitration clause, with the understanding that our determination applies to Buck and Hubbard.

III.

A.

For the most part federal courts have rejected attempts by introducing brokers to invoke arbitration clauses in agreements between their customers and clearing brokers. See, e.g., McPheeters v. McGinn,

7

Smith & Co., 953 F.2d 771 (2d Cir. 1992); Mowbray v. Moseley, Hallgarten, Estabrook & Weeden, Inc., 795 F.2d 1111 (1st Cir. 1986); Taylor v. Investors Assocs., 29 F.3d 211 (5th Cir. 1994); O'Connor v. R.F. Lafferty & Co., 965 F.2d 893 (10th Cir. 1992).

An introducing broker has been permitted to invoke the arbitration provision in a customer-clearing broker agreement only in two situations that rarely occur: when the introducing broker is the agent of the clearing broker or when the introducing broker is a third-party beneficiary to the agreement. In this appeal F. N. Wolf has not advanced either of these theories, but we discuss them briefly to illustrate how difficult it is for introducing brokers to take advantage of arbitration clauses in customer-clearing broker agreements.

Courts have concluded that the standard arrangement between an introducing and clearing broker, such as the one between F. N. Wolf and Prudential here, does not support a claim that the introducing broker is the agent of the clearing broker. See, e.g., Taylor, 29 F.3d at 214-15; Lenhart v. Westfield Fin. Corp., 909 F. Supp. 744, 749-50 (D. Haw. 1995); Shaffer v. Stratton Oakmont, Inc. , 756 F. Supp. 365, 369 (N.D. Ill. 1991); Kyung Sup Ahn, M.C., P.C. v. Rooney, Pace Inc., 624 F. Supp. 368, 370-71 (S.D.N.Y. 1985). Only in very limited circumstances have introducing brokers been recognized as agents of clearing brokers. See, e.g., Nesslage v. York Sec., Inc., 823 F.2d 231, 233 (8th Cir. 1987) (holding that introducing broker, who was disclosed agent of clearing broker, could take advantage of arbitration clause in client-clearing broker agreement); Okcuoglu v. Hess, Grant & Co., 580 F. Supp. 749, 751-52 (E.D. Pa. 1984) (finding that introducing broker acted as agent for clearing broker in approving customers for options trading). Although it does not appear that F. N. Wolf made an agency argument in district court, the court nevertheless concluded that "Wolf is not Prudential Securities's agent." Coltrain, 818 F. Supp. at 163.

The second instance in which an introducing broker has been allowed to take advantage of the arbitration clause in a customer-clearing broker agreement is when the introducing broker is made the third-party beneficiary of the agreement. However,"where an agreement between a customer and a clearing broker does not express a clear intent to benefit the introducing broker, the introducing firm will

8

not be held to be a third-party beneficiary." Monisoff v. American Eagle Inv., Inc., 927 F. Supp. 137, 138 (S.D.N.Y.) (citations omitted), aff'd 104 F.3d 356 (2d Cir. 1996). Courts usually find that the requisite intent to benefit is lacking and do not permit introducing brokers to compel arbitration as third-party beneficiaries. See, e.g., Taylor, 29 F.3d at 215; Conway v. Icahn & Co., 16 F.3d 504, 509 (2d Cir. 1994); O'Connor, 965 F.2d at 901-02; Monisoff, 927 F. Supp. at 138; Lenhart, 909 F. Supp. at 750-51; Wilson v. D.H. Blair & Co., 731 F. Supp. 1359, 1362 (N.D. Ind. 1990). Courts have found that the introducing broker has third-party beneficiary status only where a specific provision in the customer-clearing broker agreement makes the arbitration clause applicable to the introducing broker. See, e.g., Whisler v. H.J. Meyers & Co., 948 F. Supp. 798, 801 (N.D. Ill. 1996) (contract with clearing broker explicitly included introducing broker in arbitration clause); Ziegler v. Whale Sec. Co., 786 F. Supp. 739, 743 (N.D. Ind. 1992) (same). It also appears that F. N. Wolf did not claim third-party beneficiary status in district court. In any event, the district court found nothing in the circumstances or in the Prudential Agreement to establish an intent to benefit Wolf. It therefore determined that "there is no evidence that Wolf was intended to be a beneficiary of the agreement." Coltrain, 818 F. Supp. at 163.

B.

Perhaps recognizing the futility of asserting an agency or third-party beneficiary theory to invoke the clearing broker's arbitration clause, F. N. Wolf makes a different argument. **5** It claims to be an actual party to the Prudential Agreement based on three allegations: (1) F. N. Wolf is expressly referred to in the agreement, (2) the agreement's language and the circumstances of its execution entitle F. N. Wolf to compel arbitration, and (3) the course of dealing between the customers and F. N. Wolf make Wolf a party to the agreement. We will now evaluate each of Wolf's arguments.

_____

**5** Although for convenience we refer to the argument as Wolf's, it is now Buck and Hubbard who press it.

1.

F. N. Wolf first argues that it is referred to expressly in the Prudential Agreement. In an effort to prove this, F. N. Wolf points to letters and numbers written in boxes under the Prudential letterhead: "EWP" and "B5," which turned out to be the codes for Wolf's Virginia Beach branch office and the account executive, Buck; and "015541" and "024931," which happened to be the customers' account numbers at Wolf. The issue, of course, is whether these references are clear enough to make F. N. Wolf a party to the agreement.

"While the parties [to an agreement] need not be named formally, there can be no enforceable agreement unless [they] . . . can be identified with reasonable certainty." Conway v. Ichan & Co., 787 F. Supp. 340, 344 (S.D.N.Y. 1990) (internal quotations omitted), aff'd 16 F.3d 504 (2d Cir. 1994). The district court found that the Prudential Agreement "lacked any meaningful identification of Wolf" because the customers "had no reference from which to equate[the letter and number codes] to Wolf." Coltrain, 818 F. Supp. at 163-64. The court thus concluded "that Wolf [was] not identified with reasonable certainty in the agreement." Id. This ruling is consistent with that of other courts in similar circumstances. See, e.g., O'Connor v. R.F. Lafferty & Co., 965 F.2d 893, 902 (10th Cir. 1992) (account agreement on clearing broker's letterhead with name of introducing broker stamped at top insufficient to bind customer to arbitration with introducing broker); Wilson v. D.H. Blair & Co., 731 F. Supp. 1359, 1360 & n.1 (N.D. Ind. 1990) (refusing to allow introducing broker to arbitrate with customer despite assumption that account number on customer-clearing broker agreement reflected customer's account with introducing broker). There is nothing to suggest that the customers in this case knew or should have known that the codes and numbers identified F. N. Wolf and made Wolf a party to the agreement. It thus cannot be said that F. N. Wolf is expressly referred to in the Prudential Agreement.

2.

F. N. Wolf next argues that certain language in the Prudential Agreement and the circumstances surrounding the establishment of the customers' accounts with F. N. Wolf establish Wolf as a party to the agreement.

10

First, F. N. Wolf notes that the Prudential Agreement refers to a "joint trading account," and Wolf points out that the customers had a trading account with it, not Prudential. Wolf also asserts that the agreement refers to certain retail functions, such as placing orders, and that these functions were performed for the customers by Wolf. Thus, according to Wolf, the agreement was meant to cover it as well as Prudential. The Prudential Agreement was certainly broad enough to cover the activities of a broker equipped to take all steps necessary to execute and clear a securities transaction. The agreement was specific enough, however, to cover the precise function Prudential performed for these accounts. This is confirmed by the arbitration clause itself: "The undersigned [customer] agrees, and by <u>carrying an account</u> for the undersigned you agree, all controversies . . . shall be determined by arbitration." (Emphasis added.) In the securities industry, clearing brokers "carry" introduced accounts, and these brokers are sometimes called "carrying brokers." <u>See</u> Minnerop, <u>supra</u>, at 841 n.1. Although the customers did not have trading accounts with Prudential, Prudential was the carrying or clearing broker, and Prudential opened accounts in their names to perform the clearing functions. Moreover, right before the Coltrains signed the agreement, Buck told Mr. Coltrain that Prudential "was a clearinghouse broker performing certain paperwork functions for [F. N. Wolf] and that the `Joint Account Agreement' was something Prudential required be signed in order for Prudential to perform such services."

Second, F. N. Wolf argues that language in its letter forwarding the Prudential Agreement to the customers for signature, coupled with language at the bottom of the agreement, suggests that F. N. Wolf was a party to the agreement. According to the Wolf letter, the firm needed the document signed "to support your account with F. N. Wolf." The enclosed Prudential Agreement said at the bottom, "We require two signed copies." In the circumstances, the statement in the transmittal letter is consistent with F. N. Wolf's need to satisfy Prudential's requirement for a signed customer agreement before it would "carry" an account as clearing broker. The transmittal letter does not indicate that Wolf was a party to the Prudential Agreement. Finally, the "we" in "we require" at the bottom of Prudential's boilerplate agreement does not include or refer to Wolf. Read in context, it is simply a corporate "we" that refers only to Prudential.

11

Third, F. N. Wolf argues that the word "you" in the body of the Prudential Agreement refers to or includes Wolf. That is not apparent, for example, from a reading of the agreement's arbitration clause, which we repeat: "The undersigned [customer] agrees, and by carrying an account for the undersigned <u>you</u> agree, all controversies which may arise between us . . . shall be determined by arbitration." (Emphasis added.) The "you" in this provision refers to the firm "carrying" the account, and that was Prudential. This reading is consistent with that of the court in <u>Conway v. Icahn & Co.</u>, 787 F. Supp. 340 (S.D.N.Y. 1990), <u>aff'd</u> 16 F.3d 504 (2d Cir. 1994), where the introducing broker also claimed that it was covered by the pronoun "you" in a client-clearing broker agreement containing language similar to that in the Prudential Agreement here. The court rejected the introducing broker's attempt to invoke the arbitration clause, concluding that "it appears from a contextual reading of the Agreement that the term `you' refers to [the clearing broker]." <u>Id.</u> at 344; <u>accord Finkel v. D. H. Blair & Co.</u>, 581 N.Y.S.2d 126 (N.Y. Sup. Ct. 1992) (interpreting Bache client-clearing broker agreement). It is therefore clear that neither the language of the Prudential Agreement nor any circumstances surrounding its execution indicate that F. N. Wolf was meant to be a party.

3.

F. N. Wolf argues finally that the established course of dealing between it and the customers illustrates that Wolf is a party to the Prudential Agreement. This argument is based on the fact that the customers bought and sold the securities in their accounts solely through F. N. Wolf. Wolf says that the customers "communicated exclusively with F. N. Wolf and had no direct dealings with Prudential Securities." Appellants' Brief at 28. F. N. Wolf therefore claims that it and the customers actually operated under the Prudential Agreement and that Wolf is therefore entitled to arbitration under it. We disagree.

The customers here received a lengthy letter, addressed "Dear Client," from Prudential. In this letter, Prudential explained that it was F. N. Wolf's clearing firm, handling back office or clearing functions, and that it had opened an account for the customers for the purpose of performing those functions. The letter also set forth a full list of Prudential's responsibilities. Because of Prudential's role, the reason

12

for a separate agreement between Prudential and the customers would have been obvious to the customers. As a result, we would be assuming too much if we said that simply as a result of their dealings with F. N. Wolf the customers had agreed to cover Wolf in the Prudential Agreement.

One other circuit court has specifically rejected the course of dealing argument when an introducing broker tried to invoke the arbitration clause in the clearing broker-customer agreement. In Mowbray v. Moseley, Hallgarten, Eastabrook & Weeden, Inc., 795 F.2d 1111, 1117 (1st Cir. 1986), the court recognized that the agreement between the investor and the clearing broker was signed in conjunction with the opening of the investors' account with the introducing broker. The introducing broker exercised full supervisory powers over the account and "stood in a `central position' between the[investors] and the clearing house." Id. Nevertheless, the court rejected the argument that the investors intended to include the introducing broker within the coverage of their agreement with the clearing broker. "[I]t does not follow from the introducing broker's de facto control over a client's account that the client originally or subsequently intended that the introducing broker be able to invoke [the clearing broker's] power to compel arbitration." Id. (emphasis in original); see also Shaffer v. Stratton Oakmont, Inc., 756 F. Supp. 365, 369 (N.D. Ill. 1991) (introducing broker's supervisory power over account and investor's lack of communication with clearing broker do not establish that investor empowered introducing broker to invoke arbitration clause in investor's agreement with clearing broker); Finkel v. D. H. Blair & Co., 581 N.Y.S.2d 126, 128 (N.Y. Sup. Ct. 1992) (absence of actual intent to include introducing broker in clearing broker's arbitration clause precluded inference of constructive consent based on conduct). We agree with this reasoning. The fact that the customers here dealt and communicated only with F. N. Wolf does not mean that they intended for Wolf to be a party to the Prudential Agreement.

* * *

If F. N. Wolf had wanted the customers to be bound to arbitrate with it, it could have written its own agreement and gotten the customers' signatures. F. N. Wolf was simply not a party to, and was not

13

covered by, the Prudential Agreement. As a result, there was no agreement to arbitrate between the customers and F. N. Wolf.

IV.

The orders and judgments of the district court are affirmed insofar as they deny the motions of F. N. Wolf's employees, Ellsworth A. Buck, Jr. and George E. Hubbard, to compel arbitration. The cases are remanded for further proceedings.

AFFIRMED AND REMANDED

14